Robert H. Welch and Rosa Lena Welch, Husband and Wife v. Commissioner.
Welch v. Commissioner
Docket Nos. 62985, 74849.
United States Tax Court
T.C. Memo 1960-163; 1960 Tax Ct. Memo LEXIS 126; 19 T.C.M. (CCH) 855; T.C.M. (RIA) 60163; August 10, 1960
*126 J. B. Fisher, Esq., Kanawha Valley Bldg., Charleston, W. Va., for the petitioners. Charles B. Norris, Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: The respondent determined deficiencies in the petitioners' income tax and additions to tax as follows: Additions to Tax
Sec. 293(b) [1]
Year
Docket No.
Deficiency
Sec. 6653(b) [2]
Sec. 294(d) [1]
1950
74849
$1,387.78
$ 693.90
$ 80.45
1951
74849
1,255.51
627.76
59.37
1952
62985
5,751.20
1953
74849
1,787.62
893.81
98.14
1954
74849
5,664.92
2,832.46
802.03
1955
74849
8,435.79
4,217.89
1956
74849
5,082.30
2,541.15 By stipulation at trial, the respondent conceded that the petitioners are not liable for the section 293(b) and section 6653(b) additions to tax and, accordingly, further stipulated that his determination of deficiencies for the years 1950 and 1951 are barred by the statute of limitations. Amending his answer at trial, respondent asserted additions to tax under sections 293(a) and *127 6653(a) of the Internal Revenue Codes of 1939 and 1954, respectively, for the years 1953, 1954, 1955, and 1956. The issues for decisions are: (1) Whether the proposed deficiency for the year 1952, based on specific item adjustments, is arbitrary or excessive so that no presumption of correctness attaches to the respondent's determination; (2) Whether, in a net worth computation for the years 1953 through 1956 (a) the proposed deficiencies for those years are arbitrary or excessive so that the presumption of correctness of the respondent's determination is not applicable, (b) certain assets and liabilities should have been omitted or included in the schedules of assets and liabilities, and (c) certain alleged nondeductible expenditures should have been added to the income determined for those years; (3) Whether the petitioners are liable for additions to tax provided by sections 293(a) of the 1939 Code and 6653(a) of the 1954 Code for negligence in the preparation of their income tax returns for each of the years 1953, 1954, 1955, and 1956; and (4) Whether the petitioners are liable for additions to the tax provided by section 294(d) of the Internal *128 Revenue Code of 1939 for failure to file a declaration of estimated tax for 1954 and for substantial underestimation of estimated tax for 1953 and 1954. Findings of Fact Some of the facts are stipulated and are hereby found as stipulated. During the taxable years, petitioners were husband and wife and resided in South Charleston, West Virginia. They filed joint returns on the cash basis for the years 1952-1956, inclusive, with the district director of internal revenue, Parkersburg, West Virginia. Petitioner Robert H. Welch, hereinafter sometimes referred to as Robert, was employed by the Westvaco Corporation from 1933 until some time in 1954. Westvaco Corporation was engaged in the food machinery business. Petitioner Rosa L. Welch, hereinafter sometimes referred to as Rosa, was employed by Westvaco Corporation throughout the years 1952-1956, inclusive. In addition to his employment by Westvaco Corporation, Robert was engaged in buying, selling, and renting real estate during the years 1952 through 1956. Sometime in 1954, or before, Robert and Santon caused a corporation known as "Santon & Welch Enterprises" to be created. Robert contributed capital to this corporation, *129 hereinafter referred to as the corporation, in exchange for 50 per cent of the stock. During part of 1954, all of 1955, and part of 1956, the corporation was engaged in the operation of a restaurant known as the Sirloiner. During 1954, 1955, and 1956, Robert advanced money to the corporation and on occasion purchased assets for the corporation. The corporation was indebted to Robert as of December 31, 1956, on a note in the amount of $3,000 and for the following payments made by him: $400 for a sign; $498 for legal fees; $6.47 for interest; $2,577.78 for miscellaneous corporate expenses; and $31.75 for insurance. The corporation ceased to engage in the restaurant business on January 13, 1956. At that time, it had no net assets. At the time of this trial the corporation had no assets. Robert's capital investment in and receivables from the corporation became worthless in 1956. During 1956, Robert became a party to a civil action pending in the Common Pleas Court of Kanawha County, West Virginia. This action, brought by Santon, involved alleged indebtedness of Robert to Santon. In this suit, Robert filed a claim for the items owed to him by the corporation. No determination of *130 Robert's liability, if any, had been made as of December 31, 1956. At some time subsequent to December 31, 1956, Robert made an offer to settle the suit brought by Santon. The offer was that Robert would pay to Santon the sum of $6,500 in settlement of the controversy. In a letter dated February 11, 1959, attorneys for Santon rejected the offer. In respect of a note executed by John Pauley, Robert owned the note on December 31 of each of the years 1952, 1953, 1954, 1955, and 1956. Robert maintained two safe deposit boxes. The first was at the Kanawha Valley Bank in Charleston, West Virginia. The second was at the Colonial American National Bank of Roanoke, in Roanoke, Virginia, the place of residence of Rosa's family. The latter safe deposit box was maintained in the names of "Robert H. Welch and/or Mrs. Helen T. Kidd." The box in Roanoke was obtained in April 1949. The records of the bank in Roanoke revealed that access to this box was had during the years 1951 through 1956 only on March 3, 1951, August 25, 1951, and July 6, 1955. Robert maintained some books and records of business transactions. These books and records were made available to and were examined by respondent's *131 agents. Robert did not keep any records of amounts of cash maintained in his safe deposit boxes. Robert purchased two $1,000 United States Government Savings Bonds on October 6, 1954, and twelve $1,000 United States Government Savings Bonds on July 6, 1955. These bonds were purchased in Roanoke, Virginia. Each of these 14 bonds was purchased in the names of "Robert H. Welch or Solomon H. Welch." Solomon H. Welch is Robert's father and was, at the time of this trial, 71 years of age. Robert was not indebted to his father, Solomon H. Welch, for any amount in connection with the purchase of these bonds. Robert had in his safe deposit box in Roanoke, Virginia, at the beginning of 1953, 1954, and 1955, the sum of $9,000 in cash. This sum was expended by Robert on July 6, 1955, in Roanoke, Virginia, for twelve $1,000 United States Government Savings Bonds. Petitioners otherwise had on hand at the beginning of 1953 and at the end of each of the years 1953 through 1956 cash in the sum of $1,000. In 1954, Robert borrowed $25,000 from the Farmers' Building and Loan Association. Part of this $25,000, namely, $6,000, was given to Robert in a check made out to Robert's mother. This check, *132 dated September 11, 1954, was endorsed by Robert's mother and by Robert. Robert had borrowed the sums of $2,500 from his mother in 1953 and $3,500 in 1954. Robert executed two promissory notes for these sums which he borrowed from his mother. In 1954, Robert intended to repay the $6,000 to his mother but found that he needed the money in his business activities. Robert's mother endorsed the check from the Farmers' Building and Loan Association to Robert, retaining the two promissory notes which Robert had previously executed. These notes were in existence at the time of the trial. Robert was indebted to his mother in the amount of $6,000 at December 31, 1956. In 1956 Robert borrowed $15,000 from Joe Wilan for the purpose of going back into business. Robert incurred costs of $467 in securing this loan. In 1954 Robert expended $23.30 for the purchase of a locker. During at least part of the period in which the corporation operated the Sirloiner, the locker was used on the restaurant premises to store scratch pads, guest check books, and other miscellaneous items. In 1955 Robert had nondeductible cash expenditures, other than personal living expenses, in the amount of $900. *133 In 1956 Robert paid legal fees of at least $300. These fees were for professional services in setting up the corporation and defending the corporation in a suit brought against it. Rosa was employed at Westvaco Corporation throughout the years 1953, 1954, 1955, and 1956. The salary she received, less payroll deductions, was expended by her for the household expenses of the petitioners and their child. Rosa's salary, Federal income tax withheld, and F.I.C.A. tax withheld for the years in issue were as follows: Federal
Gross
Income
F.I.C.A.
Year
Salary
Tax Withheld
Taxes
1953
$3,718.76
$738.20
$54.00
1954
3,817.58
566.50
72.00
1955
4,048.23
612.30
80.96
1956
4,237.59
640.80
84.00 Robert occasionally contributed additional amounts for the petitioners' living expenses. In addition to the normal household expenses, petitioners maintained an automobile during all years in issue. Robert and Rosa made a trip to Florida in 1954, and Robert made trips to Florida in 1955 and 1956. Petitioners had nondeductible expenditures for personal living expenses for the years and in the amounts as follows: 1953
$3,250
1954
3,700
1955
3,900
1956
4,000
*134 During the year 1949, Robert borrowed $290.70 to make improvements on his home. During the year 1950, Robert purchased a television set, financing the purchase in part by obtaining an installment loan for the unpaid balance. During the year 1954, Robert purchased a washing machine and a television set at a combined cost of $440, financing the purchases in part by obtaining an installment loan for the unpaid balance. The petitioners were not negligent in the preparation of their income tax returns for the years 1953 through 1956. The petitioners failed to file a declaration of estimated tax for the year 1954. Opinion Respondent determined petitioners' net income for the year 1952 by making specific adjustments to the return filed by the petitioners on the cash receipts and disbursements method and for the years 1953 through 1956 by the increase in net worth plus nondeductible expenditures method. As to all years, petitioners contend that the respondent's determination of deficiency is arbitrary and excessive, causing the presumption of correctness of the respondent's determination to be inapplicable. Admittedly, if the respondent's determination is shown to be arbitrary *135 or excessive, the presumption of correctness in favor of his determination disappears and he then has the burden of proving the correctness of his determination. See Helvering v. Taylor, 293 U.S. 507 (1935); Harp v. Commissioner, 263 F. 2d 139, 141 (C.A. 6, 1959). As to the respondent's determination of a deficiency for the year 1952, petitioners point to statements of their assets and liabilities at both the beginning and end of that year, conclude that the difference between these net figures represents the adjustment to their net worth for the year, and allege that the purported decrease in their net worth for the year is so at variance with the respondent's proposed deficiency of $5,751.20 as to demonstrate that his determination is arbitrary. Respondent's proposed deficiency was based on disallowed depreciation and expenses on rental property and the disallowed cost of a capital asset which had been sold, all of which items respondent alleged were unsubstantiated. Apart from the petitioners' failure to adjust the difference between their opening and closing net worth for 1952 by the amount of their nondeductible expenditures for that year, it is *136 clear that the respondent may choose to use the petitioners' accounting method to determine their income, making adjustments only to correct for errors committed by the petitioners in the application of that method. Where the respondent has chosen to use the petitioners' accounting method, the petitioners may not themselves disavow their adopted method and compel the use of the net worth method. Not only may the respondent use the petitioners' acccounting method to determine their income, but he is also under no obligation to make a net worth computation as corroboration of or for comparison with his proposed deficiency. United Dressed Beef Co., 23 T.C. 879, 885 (1955). We cannot find, on the evidence before us, that the respondent's determination of a deficiency for the year 1952 was either arbitrary or excessive. In respect of the proposed deficiencies for the years 1953 through 1956, determined by the respondent by use of the increase in net worth plus nondeductible expenditures method, petitioners allege that they are excessive. The petitioners' position is that for the years 1952 through 1956 the total of the increase in net worth for each of these years as agreed *137 to by stipulation at the trial is only 59 per cent of the total of the increase of each of these years as found in the statutory notices of deficiency. Eliminating 1952 which we have decided is not part of the net worth computation, the total of the increases in net worth for each of these years, based on the stipulation at trial, is only 53.6 per cent of the total found in the statutory notices of deficiency. However, what the petitioners fail to point out is that the stipulation at trial to which they refer included only those assets and liabilities as to which the parties were in agreement. Petitioners' calculations give no effect to the disputed items of inclusion or omission, only some of which we have decided in the petitioners' favor. We do not find that the petitioners have met their burden of showing that the respondent's determinations for the years 1953 through 1956 were arbitrary and excessive. The specific adjustments proposed by the respondent to the income of the petitioners for the year 1952 resulted in the determination by respondent of a deficiency in petitioners' income tax for that year. Petitioners, relying exclusively on their argument of arbitrariness in *138 the respondent's method of determining this deficiency, have introduced no evidence regarding these adjustments. Thus, the petitioners have failed to overcome the presumption of correctness of the deficiency determined by the respondent for the year 1952, and the respondent's determination for this year must be sustained. In respect of the computation of petitioners' income for the years 1953 through 1956, the parties are in agreement as to the use of the net worth plus nondeductible expenditures method and, with certain exceptions, as to the correctness of the schedules of opening and closing assets and liabilities prepared by the respondent. The only issues to be decided regarding the determination of the petitioners' income for these years are the inclusion of certain assets, the deduction of certain liabilities, and the addition to the increase in net worth of certain expenditures. The respondent has included in the petitioners' schedule of assets as of December 31, 1956, Robert's capital account in the corporation stipulated to be in the amount $2,187.75, a note of the corporation in the amount of $3,000, and certain other receivables from the corporation for monies paid on *139 its behalf in the stipulated amount of $3,514. Petitioners contend that these items, although correct in amount, became worthless in the year 1956 and accordingly should not be included in their schedule of assets as of the end of that year. Proof of a deductible loss in 1956, by establishment of the total worthlessness of these itesm in that year, would require their exclusion from the schedule of assets prepared as of December 31, 1956. The burden of proof to establish a deductible loss is upon the petitioners. Burnet v. Houston, 283 U.S. 223, 227 (1931). Petitioners' evidence on the issue of worthlessness of these items consisted of the testimony of Robert to the effect that the corporation ceased to do business on January 13, 1956, that the corporation had no net assets in January of 1956, that the corporation had no assets at the time of the trial, and that although he had filed a claim covering these items in a suit brought against him in the Common Pleas Court of Kanawha County, West Virginia, he had never received any payment of his claim. The suit brought against Robert, styled Santon v. Santon & Welch Enterprises, Inc., et al., was still pending at the date *140 of this trial. We have found Robert's uncontroverted testimony on this point to be convincing. The general requirement that losses be deducted in the year in which they are sustained calling for a practical test, Boehm v. Commissioner, 326 U.S. 287 (1945), citing Lucas v. American Code Co., 280 U.S. 445, 449 (1930), we have found these items to have become totally worthless in the year 1956. Whatever the merit of the suit brought against Robert, whether in part a derivative suit for the benefit of the corporation or not, we find that the existence of this possible right in the corporation at December 31, 1956, did not affect the worthlessness of Robert's capital interest and claims against the corporation as of that date. Cf. Boehm v. Commissioner, supra; Charles A. Dana, 6 T.C. 177 (1946); E. R. Hawke, 35 B.T.A. 784 (1937). Accordingly, Robert's capital account and receivables of the corporation should not have been included in his schedule of assets as of December 31, 1956. Petitioners next contend that respondent erroneously included in their schedule of assets as of the end of 1955 and 1956 the sum of $5,250 *141 representing United States Government Savings Bonds allegedly owned by Robert's father. Robert testified that such bonds costing $10,500 were acquired in his name and the name of his father, that his father supplied half of the money for these bonds and that half of the bonds belonged to his father. The money for the bonds allegedly belonging to his father came, according to Robert's testimony, from his safe deposit box in Roanoke in which, back around 1950, Robert placed $5,000 of his father's money for safekeeping. No additional funds belonging to his father were stated to be in that box, nor did Robert testify that his father furnished him with any other funds with which to purchase bonds for his account. Two $1,000 bonds were purchased on October 6, 1954. Twelve $1,000 bonds were purchased on July 6, 1955. Each of these fourteen bonds was made payable to Robert or his father. Robert, however, did not enter his safe deposit box in Roanoke during the year 1954 or at any time in 1955 prior to July 6th. Notwithstanding Robert's testimony and the testimony by his father that the testimony of his son about some bonds owned jointly with him was correct, we do not believe that any of *142 these fourteen bonds, retained in the exclusive possession of Robert, belonged to Robert's father. The purchase in October 1954 of two bonds at a total cost of $1,500, and at an alleged cost to Robert's father of $750, without payment by the father until July 1955, or testimony by either Robert or his father regarding some understanding between them as to a transfer of the father's funds allegedly in Robert's possession at that time, or arrangement for future payment, suggest to us that these bonds were purchased by Robert with his own funds. Consistent with our construction of the facts and testimony set forth above, we do not believe that Robert was indebted to his father in the amount of $5,250, as alleged by petitioners, in respect of these bonds. The respondent's inclusion of $10,500, representing the cost of these fourteen bonds, in petitioners' schedule of assets as of the end of 1955 and 1956, and his refusal to increase petitioners' liabilities in the amount of $5,250 in respect of these bonds, are correct. A note receivable from John Pauley was acknowledged by the petitioners to be in the amounts specified by the respondent at the end of 1952, 1953, 1954, 1955 and 1956 *143 but was not acknowledged to be properly included in the petitioners' assets as of those dates. This objection to inclusion of the note was abandoned on brief and the respondent's inclusion in the petitioners' assets of the amounts stipulated at the dates mentioned must be sustained. On brief, petitioners claim error in the respondent's inclusion in their assets at the end of the years 1952 through 1956 of the sum of $2,500 claimed by respondent to be an expenditure by Robert for improvements to his personal residence. Inasmuch as we have confined the computation of the petitioners' income by the net worth plus nondeductible expenditures method to the years 1953 through 1956 and the respondent has included this amount in the petitioners' assets at the beginning and end of each of those years, this inclusion has no effect upon the net worth increase for any year. The last asset item which is contested is the amount of cash that the petitioners had on hand at the beginning of 1953 and through the end of 1954. Petitioners contend that they had the sum of $14,000 on hand at these times. It was established that Robert maintained two safe deposit boxes. It was further established that *144 Robert entered his box at Roanoke on August 25, 1951, and did not enter this box between August 25, 1951, and July 6, 1955, on which day he purchased twelve $1,000 United States Government Savings Bonds at a cost of $9,000. The only other evidence regarding the existence of the alleged cash hoard was the uncorroborated testimony of Robert. During the years 1953 and 1954, and for several years prior to this, Robert admittedly made frequent small loans for the purpose, among others, of financing purchases of a washing machine and television set. Robert maintained no records of the amount of cash he kept in his safe deposit boxes. We have found that Robert expended the sum of $9,000 in July of 1955, a period when the corporation was engaged in the apparently unprofitable operation of the restaurant business and when Robert was making loans to and paying bills for the account of the corporation. The evidence presented by the respondent established that subsequent to August 25, 1951, Robert's safe deposit box in Roanoke had not been entered until July 6, 1955. On that day, Robert expended $9,000 for the bonds. We find that Robert had $9,000 in that box on July 6, 1955, and for the preceding *145 period through at least August 25, 1951. In light of the entire record revealing Robert's business transactions, we also conclude that he had the sum of $1,000 in cash on hand on the first and last days of each of the years 1953 through 1956. See Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930). On the liability side, petitioners allege error in the respondent's refusal to include in their liabilities at the end of 1953 and 1954 the amounts of $2,500 and $6,000, respectively, allegedly owed by Robert to his mother, and in the respondent's refusal to include in their liabilities at the end of 1956 an amount not less than $6,500 allegedly owed on account of litigation pending in respect of Robert's affairs with the corporation. Robert testified that he borrowed a total of $6,000 from his mother in 1953 and 1954 and that he wrote out promissory notes for the amounts borrowed. He testified that in 1954, when he obtained a $25,000 loan from the Farmers' Building and Loan Association, he intended to repay the $6,000 to his mother and that to this end he had the Association give him $6,000 of the proceeds of the loan in a check made out to his mother. On trial, Robert *146 testified that the endorsements on the back of the check were those of his mother and himself, that the check was dated September 11, 1954, and was numbered 28851. The check itself, however, was not introduced into evidence. Finding that the restaurant business of the corporation was taking more money than he had available, Robert testified that he reborrowed the $6,000 from his mother in 1954. On cross examination, the following took place: "Q: Did you ever make a record of this $6,000 that you owed to your mother? "A: Not on my books, no, sir. I had it down on my little piece of paper, stuff like that. I knew I owed it to her. "Q: You are positive that you gave your mother a note for that amount? "A: Yes, I gave it to her. "Q: Wouldn't it be very convincing if you had that note right now? "A: All I gave her was a promissory note, just write on a piece of paper. "(Document handed to witness by his counsel.) "I have two here, my father had those. "* * * [Counsel for petitioners] Let the record show the two notes were obtained from the witness' father, who is in the courtroom at this time. "(Document handed to * * * [respondent's counsel].)" The document *147 handed to Robert and to respondent's counsel was not introduced into evidence. At this point, however, respondent's counsel abandoned his questioning on Robert's indebtedness to his mother. We have found that Robert was in fact indebted to his mother in the amount of $2,500 at the end of 1953, and in the amount of $6,000 at the end of each of the years 1954, 1955 and 1956 and that respondent erred in refusing to include these amounts in petitioners' liabilities at those dates. Petitioners' claim that respondent should have increased their liabilities at the end of 1956 in the amount of $6,500 is predicated on Robert's offer to pay that sum in settlement of the suit pending against him. Although Robert's liability, if any, was not determined as of December 31, 1956, or as of the date of this trial, and although the offer was made subsequent to December 31, 1956, and was then rejected, petitioners contend that Robert's liability will not be less than $6,500 and that such liability should have been added to his liabilities at December 31, 1956. On the evidence presented, it does not appear that Robert had conceded his liability for the amount of $6,500 as of December 31, 1956. Furthermore, *148 we have found that no liability was determined as of that date. Robert's subsequent offer was made in an effort to settle the controversy, and not as an admisison of liability if not accepted as the basis for settlement. We find that Robert's liability in connection with the litigation, at December 31, 1956, was contingent upon the outcome of the suit. As such, it was not properly included in petitioners' liabilities at the end of 1956. Added to the increases in net worth for the years 1953 through 1956 were several items determined by the respondent to be nondeductible expenditures made by petitioners. The first of these items was the amount of $467 expended by Robert to secure a loan of $15,000 from Joe Wilan. Petitioners' objection to the addition of this amount is that the $467 constituted a business expense and was hence deductible. However, loan expenses must be prorated over the life of the loan and deducted accordingly, whether the taxpayer is on the cash or the accrual basis. Julia Stow Lovejoy, 18 B.T.A. 1179 (1930). Petitioners having failed to introduce any evidence as to the life of this loan, we must sustain respondent's determination that no part of the *149 $467 constituted a proper deduction in 1956 and that the entire amount accordingly constituted a nondeductible expenditure. A similar failure of proof on the part of the petitioners exists in respect of the $23.30 expended by Robert for the acquisition of a locker and the $900 of other cash expenditures determined by the respondent to have been made by petitioners during 1955. Notwithstanding Robert's testimony that the locker was used on the business premises of the corporation, petitioners introduced no evidence as to the ownership of the locker, whether it was Robert's or the corporation's; ultimate disposition of the locker; whether it had a useful life in excess of one year and, if so, the period of that useful life. On this record, we have no alternative but to sustain the respondent's determination that these items were nondeductible expenditures. On the item of $300 paid by Robert for legal fees during 1956, Robert testified generally that he had expended approximately $500 during 1956 for legal fees incurred by the corporation. The matters in respect of which these fees were incurred were described as the organization of the corporation and the defense of the corporation *150 in a suit brought against it by one of its employees. We have found that Robert expended this $300 for the account of the corporation, that the corporation was indebted to Robert for that amount at December 31, 1956, and that this indebtedness became worthless sometime during 1956. Accordingly, this amount should not have been treated as a nondeductible expenditure. The last items of nondeductible expenditures are the personal living expenses of the petitioners for the years 1953 through 1956. On the basis of the respondent's estimates, he determined petitioners' living expenses to be as follows: Year
Amount
1953
$4,668.12
1954
4,787.67
1955
4,864.84
1956
4,129.30 Petitioners, on the other hand, estimated their personal living expenses to be not in excess of $2,000 in each of the years 1953 through 1956. Robert's testimony as to the basis upon which that estimate was made fails to carry conviction. Robert testified that Rosa used her total salary for living expenses and that he, on occasion, contributed additional sums for this purpose. We have found Rosa's salary less Federal income and F.I.C.A. taxes withheld, to be substantially in excess of the $2,000 *151 per year. Taking into account all the testimony, including Robert's admission that he contributed additional sums for petitioners' living expenses, and the testimony regarding petitioners' vacation trips to Florida, we have determined petitioners' living expenses for the years 1953 through 1956 to be as set forth in our findings. The respondent, by amendment to his answer at trial, asserted additions to tax under section 293(a) of the 1939 Code and section 6653(a) of the 1954 Code for negligence on the part of petitioners in the preparation of their income tax returns for the years 1953 through 1956. Inasmuch as these additions to tax constitute new matter raised for the first time by the respondent in an amendment to his answer, the burden of proving negligence is upon him. Rule 32, Rules of Practice of the Tax Court; American Ideal Cleaning Co., 30 B.T.A. 529, 531 (1934). We have found that Robert maintained some books and records of his business transactions, which books and records were made available to and were examined by respondent's agents. Robert did not, however, keep any records of amounts of cash maintained in his safe deposit boxes. We cannot find that *152 Robert was required to keep any records of amounts of cash maintained in his safe deposit boxes absent some proof that his books and records were inadequate as to items of cash. Respondent, upon whom the burden of proof rests on this issue, has neglected to introduce any evidence as to the general inadequacy of petitioners' books and records or to any specific aspect in which they were inadequate. In light of this complete failure of proof on the part of the respondent, we cannot find from the fact that Robert failed to keep records of amounts of cash in his safe deposit boxes that any part of the underpayment is due to negligence or intentional disregard of rules and regulations. The respondent determined additions to the tax for 1953 under section 294(d)(2) of the 1939 Code for substantial underestimation of estimated tax. The petitioners have adduced no evidence whatsoever with respect to this issue and accordingly we approve the assertion of such addition, the amount of which will be computed under Rule 50. William L. Heuer, Jr., 32 T.C. 947, 953 (1959). In respect of 1954, the respondent determined additions to the tax under sections 294(d)(1)(A) and 294(d)(2) *153 of the 1939 Code for failure to file a declaration of estimated tax and for substantial underestimation of estimated tax. The addition to tax for substantial underestimation cannot stand in light of Commissioner v. Acker, 361 U.S. 87 (1959). The burden of proving that the failure to make and file a declaration of estimated tax for 1954 was due to reasonable cause and not to willful neglect is on the petitioners. Harry Hartley, 23 T.C. 353, 360 (1954); David Courtney, 28 T.C. 658, 670 (1957). No evidence regarding this matter having been introduced, the respondent's determination is upheld. Decisions will be entered under Rule 50. Footnotes
1. Internal Revenue Code of 1939. ↩
2. Internal Revenue Code of 1954.↩