**PURSUANT TO INTERNAL REVENUE CODE SECTION 7463(b),THIS OPINION MAY NOT BE TREATED AS PRECEDENT FOR ANY OTHER CASE.**

T.C. Summary Opinion 2013-76

UNITED STATES TAX COURT

JAY DOUGLAS HASKETT AND CYNTHIA S. WEBB-HASKETT, Petitioners
v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17571-11S.                    Filed September 26, 2013.

Jay Douglas Haskett and Cynthia S. Webb-Haskett, pro sese.

Michelle M. Robles, for respondent.

SUMMARY OPINION

GUY, Special Trial Judge:  This case was heard pursuant to the provisions

of section 7463 of the Internal Revenue Code in effect when the petition was

filed.[1]  Pursuant to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

Respondent determined a deficiency of $9,880 in petitioners' joint Federal income tax for 2008 and an accuracy-related penalty of $1,976 under section 6662(a).  Petitioners filed a timely petition for redetermination with the Court pursuant to section 6213(a).

After concessions,[2] the issues remaining for decision are whether petitioners are (1) entitled to a dependency exemption deduction for Ms. Webb-Haskett's mother, (2) entitled to a deduction for charitable contributions in excess of the amount respondent allowed, (3) entitled to deductions for various expenses reported on Schedule C, and (4) liable for an accuracy-related penalty under

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code (Code), as amended, for 2008, and Rule references are to the Tax Court Rules of Practice and Procedure.  Monetary amounts are rounded to the nearest dollar.

[2]The parties agree that petitioners are entitled to deductions on Schedule C, Profit or Loss From Business, as follows:  (1) tax and license expenses of $942 (comprising $691 reported on Schedule C plus additional expenses of $251), and (2) meals and incidental expenses of $627 (after the application of the 50% limitation prescribed in sec. 274(n)).  Petitioners concede that they are unable to substantiate the deduction of $1,500 claimed on Schedule C for telephone expenses.

section 6662(a). To the extent not discussed herein, other issues are computational and flow from our decision in this case.[3]

## Background

Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated herein by this reference. Petitioners, husband and wife, resided in Florida at the time the petition was filed. Dr. Haskett is a board-certified emergency room physician and has practiced medicine since 1981. He earned a doctor of medical dentistry degree from the University of Kentucky and a medical doctor degree from the University of Oklahoma. Ms. Webb-Haskett earned a doctoral degree in education. Although she retired in 2008, she previously worked as a public school teacher and administrator and as an instructor at Indian River State College.

## I. Lottie Saputa

Lottie Saputa was Ms. Webb-Haskett's mother. Petitioners testified that, because of her failing health, Ms. Saputa moved out of her residence in Port St. Lucie, Florida, and came to live with them in November 2007. Ms. Webb-Haskett

---

[3]Respondent determined petitioners' tax deficiency after allowing a standard deduction of $10,900 and an additional deduction of $1,000 for real property tax. The notice of deficiency also states that respondent denied Ms. Webb-Haskett's claim for spousal relief. Ms. Webb-Haskett did not allege in the petition that she is entitled to spousal relief, and she did not raise the issue at trial.

generally assisted her mother with daily activities and took her to medical appointments.

In May 2008 Ms. Saputa moved to Lawnwood Commons (Lawnwood), a nursing home. The record includes several Lawnwood invoices addressed to "Lottie Saputa #230, c/o Cynthia Haskett". The invoices are dated May 1, May 22, June 20, and July 18, 2008, and reflect payments of $3,743 (including a $1,000 admission fee), $2,743, $2,743, and $1,527, respectively.

During 2008 Ms. Saputa received $7,824 in benefits from the Social Security Administration, unspecified Medicare benefits, $740 per month from the U.S. Department of Veterans Affairs (paid directly to Lawnwood), and $419 from the State of Florida (paid directly to Lawnwood). Ms. Saputa passed away on August 22, 2008.

Petitioners testified that during 2008 they paid Ms. Saputa's daily living expenses, a portion of her medical expenses, property taxes and insurance on her Port St. Lucie residence, $1,743 per month to Lawnwood for the four months from May to August 2008, and $4,529 toward her funeral expenses. Petitioners' bank records show that they paid $1,743 to Lawnwood, $249 for a walker, and $60 to a medical aide.

## II. Charitable Contributions

Ms. Webb-Haskett served on the board of directors of the Humane Society of Vero Beach & Indian River County (Humane Society).  During 2008 petitioners made separate contributions of $1,000 and $250 by cash or check to the Humane Society in connection with certain fundraising events.  The Humane Society acknowledged receipt of the $1,000 contribution in a letter to petitioners which refers to their attendance at two events:  a charitable auction "preview party" and the charitable auction itself.  The letter states in relevant part that "[d]onations are tax deductible to the extent that they exceed the $50 per person value of refreshments at the Auction."

Ms. Webb-Haskett testified that, having recently retired, she began to downsize her professional wardrobe during 2008 and donated numerous items of clothing to the Humane Society.  Petitioners produced a number of receipts for donations that they received from the Humane Society Thrift Shop (thrift shop).  By way of example, a thrift shop receipt dated February 2, 2008, consists of a standard form addressed to Ms. Webb-Haskett and signed by a thrift shop employee, along with a schedule prepared by Ms. Webb-Haskett listing 34 items of clothing (e.g., blazers, trousers, jeans, sweaters, etc.) and bed linens, and estimates of the cost of the items new, $4,460, and the value of the items in used

condition, $950. The reverse side of the schedule includes an appraisal of the donated items (generally consistent with the value that Ms. Webb-Haskett had assigned to them) and a statement that the thrift shop received the items listed on the schedule, the items were in good to excellent condition, and no goods or services were provided in exchange for the donated items. The appraisal is initialed--apparently by the person who signed the standard form described above. Petitioners believed that the appraisers were volunteer employees of the thrift shop. Some of the schedules also include a statement indicating that an appraisal was performed by Goodwill Industries, but the statements do not include the name or qualifications of the appraiser.

The remaining thrift shop receipts, dated February 20, March 31, April 8, June 22, and November 6, 2008, are similar in format to the receipt described above and indicate that petitioners donated items with aggregate values of $1,440, $2,025, $1,206, $1,915, and $2,525, respectively. In sum, petitioners claim that they donated approximately 200 items of clothing with an aggregate value of approximately $9,500 and housewares with an aggregate value of approximately $525.

III. Dr. Haskett's Physician Activities

A. Medical Doctor Associates, LLC

During 2008 Dr. Haskett worked in Arizona and Florida as an independent contractor providing medical services for Medical Doctor Associates, LLC (MDA), a health care staffing company.

1. Arizona

Dr. Haskett traveled from Florida to San Carlos Indian Hospital in San Carlos, Arizona, to provide medical services for residents of an Apache Indian reservation on the following dates: December 27, 2007, to January 2, 2008; January 18 to 23, 2008; February 18 to 24, 2008; and April 30 to May 7, 2008. Dr. Haskett's travel expenses between Florida and Arizona, including airfare, rental car charges, hotel charges, and meals and incidental expenses, normally were billed directly to and paid by MDA. MDA's records reflect that, when traveling to Arizona, Dr. Haskett normally flew round trip between Orlando, Florida, and Phoenix, Arizona.

MDA preferred that its doctors stay at Dream Manor, a hotel near San Carlos, but Dr. Haskett testified that he often chose to stay elsewhere. Dr. Haskett testified that he stayed at a Quality Inn during his February 2008 trip to Arizona and that he paid the hotel charges himself. MDA's business records indicate that

it paid $367 to Dream Manor to cover Dr. Haskett's hotel charges for February 18 to 23, 2008.

San Carlos is approximately 100 miles from Phoenix. Dr. Haskett rented a car during his trips to Arizona, and MDA paid all rental car charges except Dr. Haskett's gasoline purchases. Dr. Haskett did not retain gasoline receipts. The record includes rental car receipts which reflect that he drove 1,395, 592, 437, and 1,945 miles during his trips to Arizona ending January 2, January 23, February 24, and May 7, 2008, respectively.

During his trip to Arizona from April 30 to May 7, 2008, Dr. Haskett worked five shifts (May 1 to May 5), he spent five nights (April 30 to May 4) at a Comfort Inn in Globe, Arizona, at a daily rate (including taxes and other charges) of $91, and he spent two nights (May 5 to 6) at a Ramada Hotel in Phoenix at a daily rate (including taxes and other charges) of $75. Although MDA paid these hotel charges, it withheld $182 (the charges for a two-night stay at the Comfort Inn) from Dr. Haskett's paycheck dated May 13, 2008.

2. Florida

Dr. Haskett also provided medical services for MDA at Solantic, a medical care provider with clinics in Port St. Lucie and Vero Beach, Florida, and at Hendry Regional Medical Center (HRMC) in Clewiston, Florida. Dr. Haskett testified that

MDA's Vero Beach and Port St. Lucie clinics were 10 miles and 38 miles from his home, respectively.

MDA's business records indicate that Dr. Haskett worked at a Solantic clinic or HRMC on November 25 and December 10, 22, 30, and 31, 2008, at two of the clinics on December 17, 2008, and at a clinic and HRMC on December 19, 2008. Although Dr. Haskett appeared for work at one or more of Solantic's clinics on a few other days during December 2008, he was sent home and did not work those days because of scheduling errors.

MDA's parent corporation was acquired by another corporation in the latter half of 2008. As a result, Dr. Haskett received separate Forms 1099-MISC, Miscellaneous Income, issued by MDA and Crystal M, Inc., reporting nonemployee compensation of $14,210 and $20,520, respectively, for 2008.

B.  Medical Resources, Inc.

During 2008 Dr. Haskett worked as an attending physician for Medical Resources, Inc. (MRI), at five medical clinics in South Florida (referred to herein as Vero Beach, Okeechobee, Port St. Lucie West, Port St. Lucie South, and Ft. Pierce), and a rehabilitation center, Consulate Health Care (CHC).

Dr. Haskett testified that he normally drove from his home to the Vero Beach, Okeechobee, and CHC facilities daily, Monday through Friday, adding

trips to Port St. Lucie West on Mondays and Wednesdays, Port St. Lucie South on Tuesdays and Thursdays, and Ft. Pierce on Fridays. Dr. Haskett further testified that he routinely drove 120 miles between clinics on both Mondays and Wednesdays, 128 miles between clinics on both Tuesdays and Thursdays, and 115 miles on Fridays. He also testified that he drove round trips of 20 miles from his home to CHC on Saturdays and Sundays.

Dr. Haskett did not maintain a daily mileage log related to his work for MRI, but he kept a calendar listing his four daily clinic assignments (i.e., by name, address, and time of day he was expected to arrive at each clinic). The entries for some days are stricken with a handwritten notation that Dr. Haskett was "off" that day.

Dr. Haskett testified that he paid continuing medical education expenses (CME expenses) of $4,100 during 2008 and that MRI reimbursed him for the expenses but nevertheless included the reimbursements in his wages reported on Form W-2, Wage and Tax Statement. The record includes copies of Dr. Haskett's MRI earnings statements for the pay periods ending July 13 and August 10, 2008. Both statements include an item for "Cme" of $2,336 under the heading for

"Earnings". The record does not include a copy of Dr. Haskett's final MRI earnings statement for 2008.[4]

MRI issued two Forms W-2 to Dr. Haskett for 2008 reporting wages of $114,092 and $42,966, respectively, for a total of $157,058. There are no entries on the Forms W-2 indicating that Dr. Haskett received any payments other than wages or suggesting that Dr. Haskett's wages included reimbursements for CME expenses.

## IV. Petitioners' Joint 2008 Tax Return

Petitioners filed a joint Form 1040, U.S. Individual Income Tax Return, for 2008. They did not report any dependents on line 6c of the return.

### A. Itemized Deductions

Petitioners attached a Schedule A, Itemized Deductions, to their return and claimed a deduction of $8,000 for charitable contributions made by cash or check. Dr. Haskett testified that this item was erroneously reported inasmuch as most of

---

[4]During the trial of this case Dr. Haskett produced letters which stated that MRI had included CME expense reimbursements in the calculation of his wages for 2008. Dr. Haskett conceded that he did not know who signed the letters. He testified that MRI's owners would not return his phone calls before trial, and, therefore, he was unable to call any witnesses to authenticate the letters. Under the circumstances, the Court sustained respondent's objection and declined to admit the letters into evidence.

petitioners' charitable donations consisted of contributions of property. He further testified that he attached to the return a Form 8283, Noncash Charitable Contributions, reporting substantial contributions of clothing and housewares to the thrift shop. Respondent's records indicate that no Form 8283 was attached to petitioners' return when it was filed.

The Form 8283 that Dr. Haskett purportedly attached to the return is handwritten and is signed and dated by him. Part III of the form, requiring a declaration by an appraiser, is blank and part IV, requiring the donee's acknowledgment, is not signed but rather is initialed by an otherwise unidentified "volunteer" employee from the thrift shop.[5]

B. Schedule C

Petitioners attached a Schedule C to their return related to Dr. Haskett's physician activities. The Schedule C reports gross receipts of $35,530 (including $34,730 that MDA reported on Forms 1099-MISC), expenses of $32,641, and net profit of $2,889. Although petitioners claimed a deduction of $9,950 for vehicle expenses, they did not complete part IV of Schedule C (Information on Your

---

[5]In the event a taxpayer claims a deduction for a charitable contribution of property valued at more than $5,000, sec. 1.170A-13(c)(2)(i)(B), (3)(i)(B), (4)(i)(B), Income Tax Regs., requires the taxpayer to attach to his or her tax return a fully completed appraisal summary bearing the signatures of a qualified appraiser and a qualified representative of the donee.

Vehicle). Petitioners also claimed deductions of $16,975 for travel expenses and $3,000 for CME expenses.

## V. Tax Return Preparation

Everett A. Slone has prepared petitioners' tax returns since 1983, and he prepared their tax return for 2008. Dr. Haskett conceded at trial that he did not review petitioners' tax return in sufficient detail before it was filed. Mr. Slone is not a certified public accountant.

## Discussion

The Commissioner's determination of a taxpayer's liability in a notice of deficiency normally is presumed correct, and the taxpayer bears the burden of proving that the determination is incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). We consider as a preliminary matter petitioners' contention that the burden of proof has shifted to respondent pursuant to section 7491(a).

Section 7491(a) provides that the burden of proof may shift to the Commissioner as to any factual issue relevant to a taxpayer's liability for tax if (1) the taxpayer introduces credible evidence with respect to that issue; and (2) the taxpayer satisfies certain other conditions, including substantiation of any item and cooperation with the Government's requests for witnesses, documents, other information, and meetings. Sec. 7491(a)(1) and (2); see also Rule 142(a)(2). The

taxpayer bears the burden of proving that the requirements of section 7491(a) have been met.  See Rolfs v. Commissioner, 135 T.C. 471, 483 (2010), aff'd, 668 F.3d 888 (7th Cir. 2012).  As we explain below, petitioners failed to present credible evidence sufficient to substantiate most of the items in dispute.  On those issues, the burden of proof remains with petitioners.  Petitioners presented credible evidence sufficient to substantiate a portion of their vehicle expenses.  However, because we decide that issue in petitioners' favor on the preponderance of the evidence, the allocation of the burden of proof is immaterial.  See Knudsen v. Commissioner, 131 T.C. 185, 189 (2008).

Deductions are a matter of legislative grace, and the taxpayer generally bears the burden of proving entitlement to any deduction claimed.  Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).  A taxpayer must substantiate deductions claimed by keeping and producing adequate records that enable the Commissioner to determine the taxpayer's correct tax liability.  Sec. 6001; Hradesky v. Commissioner, 65 T.C. 87, 89-90 (1975), aff'd per curiam, 540 F.2d 821 (5th Cir. 1976); Meneguzzo v. Commissioner, 43 T.C. 824, 831-832 (1965).  A taxpayer claiming a deduction on a Federal income tax return must demonstrate that the deduction is allowable pursuant to a statutory provision and must further

substantiate that the expense to which the deduction relates has been paid or incurred.  Sec. 6001; Hradesky v. Commissioner, 65 T.C. at 89-90.

## I.  Lottie Saputa

Petitioners contend that they spent approximately $13,000 for Ms. Saputa's support and maintenance during 2008 and that they are therefore entitled to a deduction for the exemption amount allowed for dependents under section 151.  Respondent contends that petitioners failed to show that they provided more than one-half of Ms. Saputa's support.  We agree with respondent.

Section 151(c) provides that a taxpayer generally is allowed a deduction for the applicable exemption amount for each individual who is a dependent.  Section 152(a) defines a "dependent" to include a "qualifying child" or a "qualifying relative".  As relevant herein, a taxpayer's parent is a qualifying relative if the parent's gross income for the calendar year in which the taxable year begins is less than the exemption amount prescribed in section 151(d)[6] and if the taxpayer provides over one-half of the parent's support.  Sec. 152(d)(1) and (2).  Any amount that the parent contributes toward his or her own support, including

_____

[6]The applicable exemption amount for 2008 is $3,500.  See Rev. Proc. 2007-66, sec. 3.19(1), 2007-2 C.B. 970, 975.  Respondent concedes that after some or all of her Social Security benefits are excluded from gross income in accordance with sec. 86, Ms. Saputa's gross income was less than the exemption amount.

income which is ordinarily excluded from gross income, such as Social Security benefits, must be taken into account in determining whether the taxpayer has provided over one-half of a parent's support. Sec. 1.152-1(a)(2)(ii), Income Tax Regs.

The record does not establish that Ms. Saputa was petitioners' qualifying relative within the meaning of section 152(d). During 2008 Ms. Saputa received Social Security benefits of $7,824, monthly assistance of approximately $740 from the U.S. Department of Veterans Affairs while she resided at Lawnwood, and approximately $419 from the State of Florida--a total of slightly more than $11,000.

Although we accept petitioners' testimony that Ms. Saputa resided with them for the first four months of 2008, the bank records that they offered into evidence show only that they made the following payments: $1,743 to Lawnwood, $249 for a walker, and $60 for a medical aide. These expenditures are far short of one-half of Ms. Saputa's total support during 2008.[7] Moreover, petitioners did not offer any documentation to support the proposition that Ms. Saputa's Social Security benefits were used solely to maintain her Port St.

---

[7]Ms. Saputa's funeral expenses are not considered in determining whether petitioners furnished more than one-half of her support. See Rev. Rul. 65-307, 1965-2 C.B. 40.

Lucie residence and to pay for her medical care as opposed to being used to cover Lawnwood charges and her other daily expenses.

We are not required to, nor will we, rely on petitioners' testimony alone to establish their entitlement to the disputed dependency exemption deduction. See, e.g., Shea v. Commissioner, 112 T.C. 183, 188-189 (1999). On the record presented, we hold that petitioners are not entitled to claim Ms. Saputa as a dependent.

## II. Charitable Contributions

Petitioners claimed an itemized deduction of $8,000 on Schedule A for charitable contributions by cash or check. During the examination process, however, petitioners asserted that they had made contributions by cash or check of $1,250 and contributions of used clothing and housewares to the thrift shop totaling approximately $10,000. Respondent determined that petitioners are entitled to a deduction for charitable contributions of $4,650, comprising contributions by cash or check of $1,050[8] and noncash contributions (clothes and housewares) of $3,600.

---

[8]Respondent disallowed $200 of petitioners' contributions by cash or check to the Humane Society in connection with the auction events (described above) to account for the value of refreshments served to two guests at the two events (e.g., $50 × 2 guests × 2 events = $200).

Charitable contributions are deductible under section 170 only if verified under regulations prescribed by the Secretary. Sec. 170(a)(1). Section 170(f)(8)(A) provides that the taxpayer must obtain a contemporaneous written acknowledgment from the donee for any claimed charitable contribution deduction of $250 or more. Section 170(f)(8)(B) provides in relevant part that the contemporaneous written acknowledgment must include the amount of cash and a description of any property other than cash contributed, whether the donee organization provided any goods or services in consideration, in whole or in part for any cash or property contributed, and, if so, a description and good-faith estimate of the value of any goods or services provided by the donee. Sec. 1.170A-13(b)(1), Income Tax Regs.; see Thorpe v. Commissioner, T.C. Memo. 1998-123. Section 170(f)(8)(C) provides that a written acknowledgment is contemporaneous when the taxpayer obtains it on or before the earlier of (1) the date the taxpayer files a return for the year of contribution; or (2) the due date, including extensions, for filing that return.

In addition to the written acknowledgment requirement, section 170(f)(11) and related regulations establish more detailed requirements for substantiating contributions of property other than money. For noncash contributions of $500 or less, the taxpayer must substantiate the contribution with a receipt from the donee

indicating the donee's name, the date and location of the contribution, and "[a] description of the property in detail reasonably sufficient under the circumstances." Sec. 1.170A-13(b)(1), Income Tax Regs. For noncash contributions in excess of $500, the taxpayer normally must maintain written records showing the manner in which the item was acquired, the approximate date of acquisition, and the cost or adjusted basis of the property. Sec. 1.170A-13(b)(3), Income Tax Regs.; see Lattin v. Commissioner, T.C. Memo. 1995-233.[9] Lastly, for noncash contributions in excess of $5,000, the taxpayer must: (1) obtain a qualified appraisal for the contributed property, (2) attach a fully completed appraisal summary (i.e., Form 8283) to the tax return on which the deduction is claimed, and (3) maintain records pertaining to the claimed deduction in accordance with section 1.170A-13(b)(2)(ii), Income Tax Regs. See sec. 1.170A-13(c)(2), Income Tax Regs.

For noncash contributions, in general, the value of the contribution is the fair market value of the property at the time of contribution. Hewitt v. Commissioner, 109 T.C. 258, 261 (1997), aff'd without published opinion, 166

_____

[9]If information regarding the acquisition date or cost basis of the property is not available and the taxpayer attaches a statement to his return setting forth reasonable cause for not being able to provide such information, the taxpayer's charitable contribution deduction shall not be disallowed on that account. Sec. 1.170A-13(b)(3)(ii), Income Tax Regs.

F.3d 332 (4th Cir. 1998); sec. 1.170A-1(c)(1), Income Tax Regs.  The fair market value of contributed property is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs.

For purposes of determining whether a taxpayer's donation of property exceeds the $500 and $5,000 thresholds prescribed in section 170(f)(11), all similar items of property donated to one or more donees are treated as one property (i.e., the values of all similar items of property contributed to one or more donees are considered in the aggregate).  See sec. 170(f)(11)(F); sec. 1.170A-13(c)(1)(i), (7)(iii), Income Tax Regs.

Section 170(f)(11)(E)(i) provides that a qualified appraisal is an appraisal carried out by a qualified appraiser pursuant to regulations or other guidance prescribed by the Secretary.  Section 170(f)(11)(E)(ii) provides that a qualified appraiser generally means an individual who has earned an appraisal designation from a recognized professional appraiser organization or has otherwise met minimum education, experience, and other requirements set forth in regulations prescribed by the Secretary and regularly performs appraisals for which the individual receives compensation.  Section 1.170A-13(c)(3)(i)(B), Income Tax

Regs., provides that a qualified appraisal must be prepared, signed, and dated by a qualified appraiser. Section 1.170A-13(c)(5)(iv)(C) and (D), Income Tax Regs., provides that the donee or an employee of the donee of property cannot serve as a qualified appraiser.

### A. Contributions by Cash or Check

There is no dispute that petitioners made contributions of $1,250 by cash or check to the Humane Society. Respondent reduced by $200 the amount of the contribution that petitioners made in connection with the two related auction events, however, purportedly to account for the value of refreshments served at the events. In this regard, the Humane Society's letter stated: "Donations are tax deductible to the extent that they exceed the $50 per person value of refreshments at the Auction." Contrary to respondent's interpretation of this letter, we understand that refreshments were served at the actual auction event, as opposed to the preauction event. Taking this fact into account, we hold that petitioners have adequately substantiated charitable contributions of $1,150 by cash or check.

### B. Noncash Contributions

Petitioners contributed clothing and housewares to the thrift shop during 2008 as evidenced by receipts and related schedules. For purposes of determining whether petitioners have satisfied the substantiation requirements for noncash

contributions set forth in the Code and regulations, we are obliged to consider the aggregate value of the various categories of petitioners' noncash contributions. In this regard, petitioners contend that they contributed clothing with an aggregate value of approximately $9,500 and housewares with an aggregate value of approximately $525.

Under the circumstances, petitioners were obliged to maintain written records showing the manner in which the donated items were acquired, the approximate date of acquisition, and the cost or adjusted basis of the property. Sec. 1.170A-13(b)(3), Income Tax Regs. Petitioners failed to offer such written records at trial, and they did not show reasonable cause for not being able to provide such information. See sec. 1.170A-13(b)(3)(ii), Income Tax Regs.

In addition, petitioners claim a deduction for a charitable contribution of clothing valued at $9,500, yet they did not obtain qualified appraisals for the contributed property as required by section 1.170A-13(b)(2)(ii), (c)(2), Income Tax Regs. Although petitioners could not definitively identify the various persons whose initials appeared on the appraisals, they assumed the appraisers were volunteer employees of the thrift shop. In accordance with section 1.170A-13(c)(5)(iv)(C) and (D), Income Tax Regs., the donee or an employee of the donee

cannot serve as a qualified appraiser.[10]  Consistent with the foregoing, we hold that petitioners are not entitled to a deduction for noncash charitable contributions in excess of the amount respondent allowed.

III.  Trade or Business Expenses

Dr. Haskett claimed various deductions on Schedule C including vehicle expenses of $9,950, travel expenses of $16,975, and CME expenses of $3,000. Respondent disallowed these deductions for lack of substantiation.

Under section 162(a), a deduction is allowed for ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business.  A deduction normally is not available, however, for personal, living, or family expenses.  Sec. 262(a).  Whether an expenditure satisfies the requirements for deductibility under section 162 is a question of fact.  See Commissioner v. Heininger, 320 U.S. 467, 475 (1943).

The term "trade or business" includes performing services as an employee. Primuth v. Commissioner, 54 T.C. 374, 377-378 (1970).  However, an employee business expense is not ordinary and necessary if the employee is entitled to

_____

[10]In addition, petitioners failed to attach to their return a Form 8283 bearing the signatures of a qualified appraiser and a qualified representative of the donee. See sec. 1.170A-13(c)(2)(i)(B), (3)(i)(B), (4)(i)(B), Income Tax Regs.

reimbursement from his or her employer.  See Podems v. Commissioner, 24 T.C. 21, 22-23 (1955); Noz v. Commissioner, T.C. Memo. 2012-272.

Section 274(d) prescribes more stringent substantiation requirements before a taxpayer may deduct certain categories of expenses, including expenses related to the use of listed property as defined in section 280F(d)(4).  See Sanford v. Commissioner, 50 T.C. 823, 827 (1968), aff'd, 412 F.2d 201 (2d Cir. 1969).  As relevant here, the term "listed property" includes passenger automobiles.  Sec. 280F(d)(4)(A)(i).  To satisfy the requirements of section 274(d), a taxpayer generally must maintain adequate records or produce sufficient evidence corroborating his own statement, establishing the amount, date, and business purpose for an expenditure or business use of listed property.  Sec. 1.274-5T(b)(6), (c)(1), Temporary Income Tax Regs., 50 Fed. Reg. 46016-46017 (Nov. 6, 1985).  Section 1.274-5T(c)(2), Temporary Income Tax Regs., 50 Fed. Reg. 46017-46018 (Nov. 6, 1985), provides in relevant part that "adequate records" generally consist of an account book, a diary, a log, a statement of expense, trip sheets, or similar record made at or near the time of the expenditure or use, along with supporting documentary evidence.  Section 1.274-5(j)(2), Income Tax Regs., provides that the strict substantiation requirements for vehicle expenses prescribed in section 274(d)

must be met even where the optional standard mileage rate is used.[11]  Moreover, the Court may not use the rule established in Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930), to estimate expenses covered by section 274(d). Sanford v. Commissioner, 50 T.C. at 827; sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985).

A.  Vehicle Expenses

Dr. Haskett testified at trial that the "travel expenses" of $16,975 that he reported on Schedule C actually represented transportation expenses he incurred driving between the various clinics that he covered for MRI and for trips from home to MDA's clinics (including HRMC).  With regard to his work for MRI, Dr. Haskett testified that he routinely drove 120 miles between clinics on both Mondays and Wednesdays, 128 miles on both Tuesdays and Thursdays, 115 miles on Fridays, and 20 miles round trip from home to CHC on Saturdays and Sundays. Dr. Haskett further testified that MDA's Vero Beach and Port St. Lucie clinics were 10 miles and 38 miles from his home, respectively.

---

[11]The Commissioner generally updates the optional standard mileage rate annually.  See sec. 1.274-5(j)(2), Income Tax Regs.  Rev. Proc. 2007-70, sec. 5.01, 2007-2 C.B. 1162, 1164, established a standard mileage rate of 50.5 cents per mile effective for transportation expenses incurred on or after January 1, 2008.  The standard mileage rate was modified midyear, however, by Announcement 2008-63, 2008-2 C.B. 114, which increased the standard rate to 58.5 cents per mile for transportation expenses paid or incurred on or after July 1, 2008.

As an employee of MRI, Dr. Haskett's transportation costs related to his employment with that firm are deductible, if at all, as unreimbursed employee business expenses on Schedule A (subject to the 2% floor of section 67(a)).  In contrast, Dr. Haskett's transportation expenses related to his work as an independent contractor for MDA would be deductible, if at all, on Schedule C.

### 1.  MRI

Although Dr. Haskett did not maintain a daily mileage log related to his work for MRI, he kept a calendar listing his four daily clinic assignments by name, address, and the time of day he was expected to arrive at each location.  Some of the daily listings are stricken with a handwritten notation that Dr. Haskett was "off" that day.  His days off were largely attributable to the days that he worked for MDA in Arizona and Florida.  Respondent contends that Dr. Haskett has failed to satisfy the strict substantiation requirements for transportation expenses prescribed in section 274(d).[12]

Section 1.274-5T(c)(2)(ii)(C), Temporary Income Tax Regs., 50 Fed. Reg. 46018-46019 (Nov. 6, 1985), provides that the level of detail required in an adequate record to substantiate business use of a vehicle may vary depending upon

---

[12]Respondent does not contend that Dr. Haskett could have obtained reimbursement for his transportation expenses from MRI.

the facts and circumstances, including the fact that the taxpayer travels an established route. Having observed Dr. Haskett's demeanor at trial, we find him to be credible with respect to the weekly routes that he drove between MRI's various clinics. We conclude that his testimony, considered in conjunction with his calendar, establishes that he drove 363 miles per week between MRI clinics, over a total of 44 weeks during the year, or 15,972 miles. In computing the 15,972 miles for which Dr. Haskett may claim a deduction for vehicle expenses on Schedule A, we exclude the miles that he drove from his home to CHC on Saturdays and Sundays.[13] In short, these trips represent nondeductible personal commuting expenses. See, e.g., Heuer v. Commissioner, 32 T.C. 947, 951-953 (1959), aff'd, 283 F.2d 865 (5th Cir. 1960).

2. MDA

As for Dr. Haskett's transportation costs related to his work for MDA, nearly all of those costs were attributable to round trips from his home to MDA's clinics. Like his round trips to CHC, the trips to MDA's clinics in South Florida constitute nondeductible personal commuting expenses. See, e.g., id. Consistent

_____

[13]Of the 15,972 miles that Dr. Haskett drove during 2008, we find that he drove half of those miles before July 1, 2008, and the other half thereafter. The parties will compute the amount of the Schedule A deduction pursuant to Rule 155.

with the foregoing, we hold that petitioners are not entitled to a deduction for vehicle expenses on Schedule C related to Dr. Haskett's work for MDA in Florida.

B. Travel Expenses

Dr. Haskett conceded at trial that the $9,950 deduction reported on Schedule C for vehicle expenses was incorrect. Moreover, he could not identify with any specificity most of the expenditures deducted. In addition to a small deduction for meals and entertainment expenses that the parties have agreed to, Dr. Haskett asserted that a portion of the deduction was attributable to his work for MDA including (1) vehicle expenses he incurred driving 183 miles round trip from his home to the airport in Orlando in connection with each of his four trips to Arizona, and (2) the cost of the gasoline that he purchased for rental cars while working in Arizona.

MDA's records reflect that Dr. Haskett normally flew round trip between Orlando and Phoenix. Considering MDA's records, Dr. Haskett's testimony that he used his personal vehicle for transportation to and from the airport, and the distance between petitioners' home and Orlando, we hold that petitioners have adequately substantiated a deduction on Schedule C for travel (vehicle) expenses

equal to the applicable standard mileage rate multiplied by 732 miles (i.e., 183 miles round trip × 4 trips).[14]

Although MDA did not reimburse Dr. Haskett for gasoline he purchased while traveling in Arizona, the record does not include any receipts, credit card records, or similar documentation to substantiate these expenses. Moreover, although Dr. Haskett's rental car statements arguably provide enough information to permit the Court to estimate the amount of the deduction, such travel expenditures fall within the strict substantiation requirements of section 274(d), which preclude such an estimate.[15] See Sanford v. Commissioner, 50 T.C. at 827; sec. 1.274-5T(a), Temporary Income Tax Regs., supra.

Dr. Haskett also asserts that a portion of the $9,950 deduction was attributable to hotel charges that he paid out-of-pocket when he declined to stay at Dream Manor in Arizona. Although Dr. Haskett testified that he stayed at a Quality Inn during his February 2008 trip to Arizona and paid the hotel charges himself, he failed to produce a hotel receipt or a credit card statement

---

[14]All of Dr. Haskett's trips to Orlando are subject to the standard mileage rate in effect before July 1, 2008.

[15]Dr. Haskett's rental car statements show that he drove 1,395, 592, 437, and 1,945 miles during his trips to Arizona ending January 2, January 23, February 24, and May 7, 2008, respectively. Dr. Haskett did not explain the wide variance in the miles that he drove on these trips.

demonstrating that he paid any amount to Quality Inn. In the absence of any credible evidence substantiating Dr. Haskett's testimony, we decline to allow a deduction for Quality Inn hotel charges.

On the other hand, the record reflects that MDA deducted $182 (Comfort Inn charges for two nights) from Dr. Haskett's paycheck dated May 13, 2008. MDA's business records do not clearly explain the adjustment to Dr. Haskett's paycheck. Because the record shows that Dr. Haskett was working for MDA in San Carlos while he was staying at the Comfort Inn during May 2008, we conclude that Dr. Haskett is entitled to an additional deduction of $182 on Schedule C for travel (hotel) expenses.

## C. CME Expenses

Dr. Haskett claimed a deduction of $3,000 on Schedule C for CME expenses. He maintains that he enrolled in and paid for CME courses and that MRI reimbursed him for these expenses but inexplicably included the reimbursements in his taxable wages reported on Form W-2.[16] Dr. Haskett's

---

[16]Amounts paid to an employee as reimbursement under an accountable plan are excluded from the employee's gross income, are not reported as wages or other compensation on Form W-2, and are exempt from withholding and payment of employment taxes. Biehl v. Commissioner, 118 T.C. 467, 476 (2002), aff'd, 351 F.3d 982 (9th Cir. 2003); sec. 1.62-2(c)(4), Income Tax Regs. It appears that Dr. Haskett contends, in the alternative, that CME expense reimbursements should be

(continued...)

earnings statements issued during the middle of 2008 arguably lend some support to the proposition that MRI included payments for CME expenses in Dr. Haskett's wages. The record, however, does not include Dr. Haskett's final earnings statement from MRI for 2008, and the Forms W-2 that MRI issued to him for 2008 do not indicate whether CME expenses were included in his total wages as he contends. Moreover, there is no evidence in the record as to the specific CME programs that Dr. Haskett participated in or canceled checks, credit card records, or similar documentation to substantiate the amounts, if any, that Dr. Haskett paid for CME. On this record, we conclude that Dr. Haskett is not entitled to a Schedule C deduction for CME expenses or to exclude any amount from his taxable income for CME reimbursements.

## IV.  Accuracy-Related Penalty

Section 6662(a) and (b)(1) imposes a penalty equal to 20% of any portion of an underpayment attributable to negligence or disregard of rules or regulations. The term "negligence" includes any failure to make a reasonable attempt to comply with tax laws, and "disregard" includes any careless, reckless, or intentional disregard of rules or regulations. Sec. 6662(c). Negligence also

---

[16](...continued)
excluded from his taxable income.

includes any failure to keep adequate books and records or to substantiate items properly. Sec. 1.6662-3(b)(1), Income Tax Regs.; see Olive v. Commissioner, 139 T.C. 19, 43 (2012).

Section 6664(c)(1) provides an exception to the imposition of the accuracy-related penalty if the taxpayer establishes that there was reasonable cause for, and the taxpayer acted in good faith with respect to, the underpayment. Sec. 1.6664-4(a), Income Tax Regs. The determination of whether the taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs.

A taxpayer may be able to demonstrate reasonable cause and good faith (and thereby escape the accuracy-related penalty of section 6662) by showing reliance on professional advice. See id. However, reliance on professional advice is not an absolute defense to the section 6662(a) penalty. Freytag v. Commissioner, 89 T.C. 849, 888 (1987), aff'd, 904 F.2d 1011 (5th Cir. 1990), aff'd, 501 U.S. 868 (1991). A taxpayer asserting reliance on professional advice must prove that (1) the adviser was a competent professional with sufficient expertise to justify reliance, (2) the taxpayer provided the adviser necessary and accurate information, and (3) the taxpayer actually relied in good faith on the adviser's judgment. See

Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).  As a defense to the penalty, petitioners bear the burden of proving that they acted with reasonable cause and in good faith.  See Higbee v. Commissioner, 116 T.C. 438, 446 (2001).

With respect to a taxpayer's liability for any penalty, section 7491(c) places on the Commissioner the burden of production, thereby requiring the Commissioner to come forward with sufficient evidence indicating that it is appropriate to impose the penalty.  Id.  Once the Commissioner meets his burden of production, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect.  Id. at 447; see Rule 142(a); Welch v. Helvering, 290 U.S. at 115.

Respondent discharged his burden of production under section 7491(c) by showing that petitioners failed to keep adequate records and properly substantiate most of their claimed deductions.  See sec. 1.6662-3(b)(1), Income Tax Regs.

Although petitioners relied on a paid tax preparer and trusted him to properly prepare their tax return, there is no evidence in the record regarding the return preparer's experience or qualifications that would support the conclusion that they reasonably relied on him.  Dr. Haskett admitted that the return that Mr. Slone prepared contained significant errors and that he did not carefully review the

return before filing it. Taxpayers have a duty to review their tax returns before signing and filing them, and the duty of filing accurate returns cannot be avoided by placing responsibility on a tax return preparer. Metra Chem Corp. v. Commissioner, 88 T.C. 654, 662 (1987); Magill v. Commissioner, 70 T.C. 465, 479-480 (1978), aff'd, 651 F.2d 1233 (6th Cir. 1981). In sum, on the record presented, petitioners failed to show that they acted with reasonable cause and in good faith within the meaning of section 6664(c)(1). Accordingly, respondent's determination that petitioners are liable for an accuracy-related penalty under section 6662(a) is sustained.

Consistent with the preceding discussion,

Decision will be entered under

Rule 155.