WILLIAM L. HEUER, JR., AND LUCILLE M. HEUER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 65538. Filed July 23, 1959.

*Elwood R. Clay, Esq.,* and *Louis J. Dutrey, Esq.,* for the petitioners.

*J. L. Bailey, Esq.,* for the respondent.

ATKINS, *Judge:* Respondent determined deficiencies in income tax of petitioners for the years 1953 and 1954 in the respective amounts of $547.64 and $423.20, and for the year 1953 determined additions to tax under section 294(d)(1)(A) and section 294(d)(2) of the Internal Revenue Code of 1939, in the respective amounts of $184.32 and $122.88.

The issue presented is whether the petitioner, a ship pilot, is entitled to deduct as ordinary and necessary business expenses, pursuant to section 23(a)(1)(A) of the Internal Revenue Code of 1939 and section 162(a)(2) of the Internal Revenue Code of 1954, the cost of maintaining and operating his automobile, as well as depreciation thereon, to the extent he used the car in traveling from his residence to points of assignment and return and in traveling from one assignment to another.

FINDINGS OF FACT.

The petitioners are husband and wife residing in New Orleans, Louisiana. They filed their joint Federal income tax returns for the years 1953 and 1954 with the district director of internal revenue in New Orleans, Louisiana. Since Lucille M. Heuer is a party to this proceeding only because she and her husband filed joint returns for the years 1953 and 1954, William L. Heuer will be referred to as the petitioner.

During the years 1953 and 1954 petitioner's occupation was that of a river pilot on the Mississippi River, engaged in piloting ships between Pilottown and New Orleans, a distance of about 90 miles, within the New Orleans harbor, and on the Intracoastal Canal and Industrial Canal. The Port of New Orleans extends from Southport

to Belle Chasse, a distance of approximately 33 miles, and includes approximately 114 wharves or docks.

The petitioner holds a master of unlimited tonnage license, also referred to as a first-class pilot's license, issued by the United States Coast Guard, and was commissioned by the governor of the State of Louisiana as a river pilot under the provisions of State law, which gives him and other commissioned pilots the sole right to pilot any and all vessels on the Mississippi.

During such years he was a member and shareholder of the Crescent River Port Pilots' Association, hereinafter referred to as the association, through which he received pilotage assignments. This association is a corporation organized under the laws of the State of Louisiana in 1908.

Membership in the association consisted of 62 qualified river pilots, each owning 1 share of nontransferable stock costing $1,000 per share. The charter provides for the election of new members at the discretion of the present members. It also provides, among other benefits to members, for a pension plan for retired members.

The affairs of the association are governed by a board of directors consisting of five shareholders elected each year. The board of directors elects from among its members a president, vice president, and secretary and also appoints a treasurer-manager and an attorney neither of whom is a shareholder or member of the association.

The charter provides that no stockholder shall be liable for the debts of the association and that the association shall not be liable for the faults of any of its members occurring while the member is exercising his calling, profession, or office under and by virtue of his license from the United States, or of his commission from the governor of the State of Louisiana.

The members are governed by bylaws, rules, and regulations of the association concerning conduct of the pilots and procedures for carrying out pilot assignments. Fines and penalties are imposed on members for various infractions. Pilots are required to report to a ship one-half hour before sailing. If sailing is delayed because of failure of a pilot to report aboard after he has been given sufficient time, the pilot is fined 1 day's pay. If he fails to take an assignment he may be fined 2 days' pay and laid off for 3 days.

The association maintains an office located in New Orleans, staffed by 9 employees, which remains open 24 hours a day. It dispatches assignments to the pilots. Louisiana statutes set forth the tariffs fixing the various fees licensed pilots may charge for specified services.[1] Tariffs are also provided fixing amounts which may be charged ship operators for pilots' transportation to and from certain docks and wharves. Each pilot, upon the rendition of services, obtains an order

---

[1] See La. Rev. Stat., tit. 34, sec. 991 et seq. (1950), as revised by Act of 1952, No. 177.

for the services rendered, which he delivers to the association. Under the charter all pilotage fees earned by the members are collected by the treasurer of the association and thereupon become its property. However, if it is necessary to institute legal proceedings to collect a fee, the suit is brought in the name of the pilot who rendered the service and the fee does not become the property of the association until collected and placed in the treasury of the association. Each month the association distributes to the members, upon the basis of the number of days and hours worked by each, the balance of income collected, after deduction of expenses.

Pilots are classified into two categories: Route pilots, who pilot ships between Pilottown and New Orleans; and shift pilots, who move ships within the Port of New Orleans. They are assigned to ships in the order in which their names appear on the pilot slate maintained by the dispatcher. The first five listed pilots on the slate are notified of their positions and must be ready at any time to receive an assignment. Shift pilots must be available for assignments either in person or by telephone at any time. A pilot does not know where his next assignment will be. He might receive an assignment from the dispatcher at any time of the day or night, including holidays. Pilots generally receive notice of assignments about 1 to 2 hours in advance of the time they are to report to the ship, but in some instances 2½ to 3-hours' notice is given. Shift pilot assignments are usually in the early morning or late in the day, because ship operators prefer to have the ships available for loading by longshoremen during regular working hours in order to pay as little overtime as possible.

The association itself furnishes transportation to its pilots in some instances as, for example, to or from Pilottown and Southport. Furthermore, between the hours of midnight and 6 a.m. the association furnishes its pilots transportation to certain specified docks and wharves. In a large number of instances in 1953 and 1954 the petitioner was thus furnished transportation. Also, in numerous instances in those years ship operators furnished the petitioner transportation to certain docks and wharves.

There remained, however, a large number of docks and wharves to and from which the petitioner found it necessary to furnish his own transportation. During the years in question petitioner was working principally as a shift pilot, although he did make some trips as a route pilot, and was on call for either type of duty at all times.

When not furnished transportation by the association or by the shipowner, the petitioner customarily used his own automobile to travel to places of assignments and back to his residence and to travel from one assignment to another. There is no convenient public transportation to many of the docks. His custom was to drive to

the dock to which a ship was to be moved in order to determine whether the berth was obstructed as, for example, by a barge. He would then drive to the dock where the ship was moored and usually arrange with the clerk representing the ship or a linesman to drive the car to the ship's new location. After completing an assignment petitioner was required to contact the dispatcher as soon as possible for further assignment. He might be assigned directly to another ship in which case he would proceed directly to the new assignment. There might be no immediate assignment in which case the petitioner might go to his home or to the association office. The petitioner is not required to be at his residence or any other particular place to receive assignments. He was permitted, but not required, to wait at the association office, and at times he did go to the office and receive assignments.

During 1953 the petitioner worked about 270 days and had about 480 piloting assignments. These were principally shift assignments although he had numerous route assignments. During that year there were about 150 days on which he had more than one assignment. In accordance with the policy of the association the petitioner was furnished his transportation to and from Pilottown and certain other points. In addition, ship operators furnished transportation to about 60 of petitioner's assignments and from about 90 of his assignments. In 1953 petitioner was not reimbursed for any transportation.

During 1954 petitioner worked about 290 days and had about 430 piloting assignments. These also were principally shift assignments but included numerous route assignments. During that year there were about 110 days on which the petitioner had more than one assignment. In accordance with the policy of the association the petitioner was furnished his transportation to and from Pilottown and certain other points. In addition, ship operators furnished transportation to about 45 of petitioner's assignments and from about 60 of his assignments. In 1954 petitioner was not reimbursed for any transportation.

In their income tax returns for the years 1953 and 1954, the petitioners reported income from Crescent River Port Pilots' Association in the amount of $13,340.69 and $13,401.37, respectively. They did not report any reimbursement of travel expenses. In their return for 1953 the petitioners deducted, among other things, $1,987.94 which represented 90 per cent of expenditures with respect to their automobile and depreciation thereon.[2] The remaining 10 per cent was conceded by the petitioners to represent personal expenses. In their return for 1954 they claimed as a deduction an amount of

---

[2] This specific figure does not appear on the return but on brief the parties are agreed that this was the amount claimed on account of car expense and depreciation.

$1,479.08 which represented 80 per cent of expenditures with respect to their automobile and depreciation. The remaining 20 per cent was conceded by the petitioners to represent personal expenses. In the notice of deficiency the respondent disallowed these amounts as deductions on the ground that they represented personal expenses incurred in going to and from work. He also determined for 1953 an addition to tax in the amount of $184.32 pursuant to section 294(d)(1)(A) of the Internal Revenue Code of 1939 for failure to file a declaration of estimated tax, and an addition to tax in the amount of $122.88, pursuant to section 294(d)(2) of the 1939 Code for substantial underestimate of estimated tax.

One-fourth of the amounts claimed as deductions by the petitioners as car expenses was paid or incurred in carrying on petitioner's trade or business and one-fourth of the depreciation claimed by the petitioners on their automobile was sustained in such trade or business.

### OPINION.

There is no dispute between the parties as to the fact that the petitioner expended the amounts claimed as car expenses and sustained the amount of depreciation on the car as claimed. However, the respondent disallowed the full amounts claimed as deductions on the ground that they represented cost of commuting to and from work.

Section 23(a)(1)(A) of the Internal Revenue Code of 1939 and section 162(a) of the Internal Revenue Code of 1954 provide for the deduction of "[a]ll the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business," and sections 23(1) of the 1939 Code and 167(a) of the 1954 Code provide for the deduction of a reasonable allowance for the exhaustion, wear, and tear of property "used in the trade or business."

The courts have always recognized a distinction between expenses of traveling incurred in carrying on a trade or business and commuting expenses, that is, those incurred in going from one's residence to one's place of work and return. The latter have always been held to be nondeductible personal expenses, as distinguished from business expenses. *Frank H. Sullivan*, 1 B.T.A. 93; *Mort L. Bixler*, 5 B.T.A. 1181; *Charles H. Sachs*, 6 B.T.A. 68; *Abraham W. Ast*, 9 B.T.A. 694; and *Charles Crowther*, 28 T.C. 1293, on appeal (C.A. 9). See also sec. 39.23(a)-2 of Regs. 118. The rule is the same regardless of the distance traveled between the residence and the place of business, regardless of any equitable consideration which makes the use of a particular mode of transportation necessary, irrespective of whether or not public transportation is available, and irrespective of whether living accommodations are available to the

taxpayer and his family at or near the place of business. *Charles Crowther, supra.*

On brief the respondent takes the position that although the petitioner was an independent contractor, and was not an employee of the association, nevertheless his place of business is the Port of New Orleans and that the costs of transportation from his residence to a particular docking area and return constitute nondeductible commuting expenses.[3]

The petitioner takes the position that none of the claimed expenses were commuting expenses. He argues that his residence was in effect his office from which he practiced his profession as a pilot, and that all trips to and from ship locations were incident to the carrying on of his trade or business.

It thus appears that the parties are in agreement that the petitioner was not an employee of the association. We find it unnecessary to pass upon that question since we think the answer to the question presented in the instant case would be the same in any event. We think the proper conclusion in the situation here presented is that the petitioner's place of employment was the area in which were located the various docks and wharves to which he was subject to being assigned and that cost of travel from his residence to any point of assignment and return constituted commuting expense. True, this was a large area and involved over 100 possible points of assignment, and the petitioner was subject to assignment at all hours; nevertheless, the petitioner's costs of travel from his residence to any point of assignment and return cannot, in our opinion, properly be considered as expenses paid or incurred in the carrying on of his trade or business. Rather, they were personal expenses incurred in traveling to and from the site of his work. We cannot agree with the petitioner that his residence is in essence his business headquarters, trips from and to which constituted business trips. The petitioner lays stress upon the fact that he received telephone calls in his home advising him of assignments, but the evidence shows that he was not required to stay there to receive such calls. All that was required was that he keep the association advised as to his whereabouts.

The situation here presented is analogous to that which we considered in *Williard I. Thompson*, 15 T.C. 609, reversed on another issue (C.A. 10) 193 F. 2d 586. There the taxpayer was a cement finisher. His custom was to drive his automobile to a union hall and then drive to his place of work which, as well as his employer, pre-

---

[3] In his original brief the respondent took the position that the petitioner was an employee of the association, but in his reply brief he receded from that position to conform to the Internal Revenue Service policy as set forth in Rev. Rul. 54–614, 1954–2 C.B. 271, in which it was held that ship pilots are not employees of the association (whether incorporated or not) of which they are members, but are independent contractors using the association as their agent, and that they are subject to the self-employment tax.

sumably varied from time to time. He claimed the car expenses in going from the union hall to the work location as a business expense. We held that the whole trip was in the nature of going to work, the expense of which was personal.

It is our conclusion that any automobile expenses or depreciation on the car attributable to travel between the petitioner's residence and points of assignment and return should be treated as nondeductible commuting expenses. On the other hand it seems clear to us that any car expenses, as well as depreciation, attributable to traveling from one assignment to another, to points of destination of ships for inspection purposes, and in moving the car from points of assignment to ship destinations in order to have it available to proceed to other assignments, are deductible. At the hearing counsel for the respondent conceded that costs of travel from one assignment to another are deductible, but stated that this was a minor item, and counsel for the petitioner agreed. However, the testimony of the petitioner developed that this travel was not negligible. In answer to a question as to whether the use of his automobile was principally from his home to place of assignment and then back home the petitioner replied that it was not. He did not state what proportion of the use of the car was for the business purposes above mentioned and the record does not contain evidence upon which this can be computed accurately. Nevertheless, we are satisfied that the petitioner is entitled to some deduction, and as stated in *Cohan* v. *Commissioner*, (C.A. 2) 39 F. 2d 540, an approximation should be made even though it may be necessary to bear heavily upon the petitioner who has the burden of proof. Accordingly, we have exercised our best judgment and have found as a fact that one-fourth of the amounts claimed as deductions by the petitioners as car expense was paid or incurred in carrying on the petitioner's trade or business and that one-fourth of the depreciation deduction claimed on the car was sustained in such trade or business. In reaching our conclusion we have taken into consideration the large number of assignments which the petitioner had in the years in question, the large area in which he worked, and the fact that on about 150 days in 1953 and about 110 days in 1954 he had more than one assignment. Respondent, for the first time on brief, argues that if the petitioner had the opportunity to receive reimbursement for transportation and for reasons of his own did not, then the amounts expended which were reimbursable would not constitute ordinary and necessary business expenses, citing *Horace E. Podems*, 24 T.C. 21. However, the petitioner testified that he received no reimbursement and the record would indicate that if he was entitled to any, the amount would be negligible.

The respondent determined additions to the tax for 1953 under sections 294(d)(1)(A) and 294(d)(2) of the 1939 Code for failure

to file a declaration of estimated tax and for substantial underestimate of estimated tax. The petitioner has adduced no evidence whatsoever with respect to this issue and accordingly we approve the assertion of such additions, the amounts of which will be computed under Rule 50. *G. E. Fuller*, 20 T.C. 308, affirmed on other issues (C.A. 10) 213 F. 2d 102; *H. G. Irby, Jr.*, 30 T.C. 1166, on appeal (C.A. 5); *Patchen* v. *Commissioner*, (C.A. 5) 258 F. 2d 544, affirming on this issue 27 T.C. 592; *Hansen* v. *Commissioner*, (C.A. 9) 258 F. 2d 585, affirming on this issue a Memorandum Opinion of this Court; and *Abbott* v. *Commissioner*, (C.A. 3) 258 F. 2d 537, affirming 28 T.C. 795. But cf. *Acker* v. *Commissioner*, (C.A. 6) 258 F. 2d 568, reversing a Memorandum Opinion of this Court, certiorari granted 358 U.S. 940.

*Decision will be entered under Rule 50.*