T.C. Memo. 2020-79

UNITED STATES TAX COURT

THERON E. JOHNSON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 30283-15.                    Filed June 8, 2020.

<u>Larry D. Harvey</u> and <u>Julia R. Prendergast</u>, for petitioner.

<u>Sara J. Barkley</u>, <u>Gretchen W. Altenburger</u>, and <u>Tamara L. Kotzker</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PUGH, <u>Judge</u>:  In a notice of deficiency dated September 25, 2015, respondent determined the following deficiencies and penalties:[1]

_____

[1] Unless otherwise indicated, all section references are to the Internal

(continued...)

[*2]

| Year | Deficiency | Penalty sec. 6662(a) |
|------|-----------|---------------------|
| 2012 | $24,244 | $4,849 |
| 2013 | 16,703 | 3,341 |
| 2014 | 26,607 | 5,321 |

After concessions,[2] the issues for decision are: (1) whether petitioner is entitled to deduct certain expenses on his Schedules F, Profit or Loss From Farming, for the years in issue and (2) the valuation of a conservation easement covering 116.14 acres of land in Delta County, Colorado.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts are incorporated in our findings by this reference. Petitioner resided in Colorado when he timely filed his petition.

---

[1](...continued) Revenue Code of 1986 (Code), as amended and in effect for the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

[2] On March 28, 2019, the parties filed a stipulation of settled issues in which respondent conceded that petitioner is not liable for a sec. 6662(a) penalty for any of the years in issue, and the parties agreed to adjustments in whole or in part for deductions on petitioner's Schedule A, Itemized Deductions, and Schedule F, for each of the years in issue.

[*3] I. Petitioner and His Ranch

Petitioner is the president of Diversified Innovative Products Co., Inc., formerly Innovative Manufacturing Co., LLC (Dip Co), a company that manufactures and sells disposable ink pans for printing presses. Dip Co manufactures the disposable ink pans at its facility in Delta, Colorado. Petitioner and the rest of Dip Co's management work from home offices because the manufacturing facility does not have enough office space for them all to work there regularly.

Before the years in issue petitioner's home office was at his ranch in Paonia, Delta County, Colorado (ranch). Petitioner purchased the ranch, which then was vacant land, on February 2, 2002, for $200,000. The ranch is in the North Fork Valley of the Gunnison River between Paonia, Colorado, and Hotchkiss, Colorado, approximately 25 miles from Dip Co's manufacturing facility.

The ranch is a combination of pasture and naturally vegetated riparian wetlands that includes 25 acres of irrigated fields from dedicated water rights and another 25 acres of subirrigated pastures that draw water from the property's creek, springs, and ponds by using open ditches along with man-made dams and gated pipes that petitioner built and installed. The ranch also provides a habitat for an extensive wildlife population that frequently grazes on the property, such as

[*4] large herds of elk, deer, and numerous other animals, including one endangered species, the leopard frog.

Petitioner uses the ranch for agricultural activities such as cattle ranching and farming, including raising hay. After purchasing the ranch he built a 3,500-square-foot single-family house and several outbuildings to use for his agricultural activities, including a barn, a hay shed, a loafing shed, and a shop for repairing and welding farming equipment.[3]

## II. Conservation Easement

In 2004 petitioner became aware of the concept of conservation easements. He determined that granting a conservation easement over the ranch would allow him in effect to create a private wildlife reserve but still be able to engage in his ranching and farming activities.

On December 18, 2007, petitioner granted a conservation easement (Conservation Easement) to Colorado Open Lands (COL), a Colorado nonprofit corporation,[4] pursuant to a deed of conservation easement (deed). The deed

---

[3] The record does not include petitioner's total cost for these improvements. As discussed below, respondent's expert determined the replacement cost for all of the improvements is $590,000.

[4] COL had previously inspected the ranch in 2004. Petitioner's expert, Arnold Butler, worked with COL at the time and conducted the inspection, but he

(continued...)

[*5] encumbered 116.14 acres of the ranch (including the land on which petitioner's house stands) along with the water rights associated with the ranch, leaving the remaining 5 acres unencumbered.[5]  It restricted the encumbered area from being subdivided, used as a feedlot, or used for commercial activities.  It also restricted all construction within the encumbered area except for a five-acre area that was designated a "building envelope".[6]  The deed limited constructed floor space inside the building envelope to 6,000 square feet for single residential improvements and a cumulative maximum of 30,000 square feet for all improvements.[7]

_____

[4](...continued)
did not value the ranch until 2019.

[5]  The deed describes a 116.14-acre conservation easement.  Rare Earth Science, LLC, prepared a Present Conditions Report (RES report) for the ranch on October 26, 2007, as part of the conservation easement process.  Page 1 reports the 116.14-acre conservation easement, but it states the ranch's total acreage (including the 5 unencumbered acres) to be 121.7 rather than 121.14.

[6]  This five-acre area included petitioner's house and several outbuildings that petitioner had built before he granted the Conservation Easement.  It is separate from the five unencumbered acres, which was vacant land.

[7] It also allowed agricultural improvements that did not exceed 10,000 square feet.

[*6] III.  Petitioner's Move to Telluride

Petitioner continued to live and work at the ranch after he granted the Conservation Easement to COL.  While petitioner completed most of his work for Dip Co from his home office, his responsibilities as Dip Co's president required travel for at least one week per month to attend industry events and meet with clients and the other members of Dip Co's management.  Many of these events and meetings took place outside Colorado, so petitioner often traveled by air.  The closest airports to the ranch are in Montrose and Grand Junction, Colorado, an hour or more away.

Because of his long commute from the ranch to these airports, as well as an economic downturn in the Delta County area affecting the quality of schools for his children, petitioner moved to Telluride, Colorado, in August 2011.  His Telluride property is approximately 120 miles south of the ranch, but only 4 miles from the nearest airport.

Before moving to Telluride petitioner phased out his cattle ranching business, but he continued farming at the ranch after he moved.  He began sharecropping hay with his neighbor during the years in issue and drove to and from the ranch to handle irrigation issues and drag the fields as the hay grew.  His neighbor mowed and bailed the hay in exchange for half of it and paid $50 per ton

[*7] for the other half. Petitioner did not profit from sharecropping, but the activity allowed him to preserve his water rights on the ranch; he was required to use those rights every year or he would lose them.

Petitioner drove between Telluride and the ranch in a pickup truck that he had purchased for $23,000 in approximately 2014 for his ranching business. Aside from sharecropping, petitioner sometimes drove to the ranch in the pickup truck to inspect and maintain the property and for personal activities, such as hunting on the property with his children, and he sometimes worked on Dip Co matters while there. Petitioner used a Microsoft Outlook calendar to coordinate his schedule and travel, but his calendar entries often did not state whether meetings took place in person or by telephone. He did not keep a log segregating the miles driven for his farming business from the miles driven for other activities.

IV. Petitioner's Tax Returns and Examination

Petitioner timely filed his Form 1040, U.S. Individual Income Tax Return for tax year 2007. Included with his 2007 return was a Schedule A, on which he claimed a $610,000 charitable contribution deduction for the Conservation Easement. During tax years 2007 through 2011 petitioner deducted a combined carryover of $265,051 related to the Conservation Easement. For the years in

**[*8]** issue he deducted carryover amounts of $74,557, $57,306, and $51,401, respectively.[8]

Petitioner's returns for the years in issue also included Schedules F on which he reported farming income of $1,200, $2,795, and $2,653, respectively. Petitioner offset this income in part with farming expense deductions. The deductions in issue, which respondent adjusted in whole or in part, are listed below:[9]

---

[8] Petitioner deducted a combined carryover of $178,628 related to his charitable contributions for 2015, 2016, and 2017. Those years are before the Court at docket No. 6364-19.

[9] Petitioner also reported $22 and $142 of expenses for 2013 and 2014, respectively, under other expenses entitled "office". The stipulation of settled issues states that petitioner is not entitled to deduct other expenses related to "office supplies", but no entry related to office supplies is listed among petitioner's specified other expenses for 2013 or 2014. Petitioner did not address these deductions in his briefs, so we conclude the "office supplies" concession to apply to the "office" expenses.

[*9]

| Expense | 2012 | 2013 | 2014 |
|---|---|---|---|
| Car and truck | $1,816 | $188 | --- |
| Repairs and maintenance | 1,881 | 2,583 | $8,702 |
| Misc. | 1,125 | --- | --- |
| Meals | 164 | 330 | 445 |
| Accounting | 350 | 350 | 613 |
| Gasoline, fuel, and oil | 653 | 3,029 | 2,583 |
| Insurance (other than health) | --- | 312 | 2,799 |
| Travel | --- | 207 | 137 |
| Software | --- | 175 | --- |
| Dues | --- | --- | 45 |
| Depreciation and sec. 179 expense | 5,310 | 3,533 | 24,756 |

In the notice of deficiency respondent denied petitioner's charitable contribution deduction for each year on the ground that he had already deducted more than the Conservation Easement's value for previous tax years. Respondent also adjusted in whole or in part petitioner's Schedule F deductions for the years in issue. As a result of those adjustments respondent determined that petitioner owed an additional $24,244, $16,703, and $26,607 of income tax for 2012, 2013, and 2014, respectively.

**[*10]**                    OPINION

I. <u>Burden of Proof</u>

Ordinarily, the burden of proof in cases before the Court is on the taxpayer. Rule 142(a)(1); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933). Section 7491(a)(1) provides that if, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B, the Commissioner shall have the burden of proof with respect to that issue. See <u>Higbee v. Commissioner</u>, 116 T.C. 438, 441-442 (2001). Petitioner makes no argument that the conditions for shifting the burden of proof have been met. He therefore bears the burden of proof.

II. <u>Schedule F Deductions</u>

Section 162 allows a taxpayer to deduct all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. Sec. 162(a); sec. 1.162-1(a), Income Tax Regs. An expense is "ordinary" if it is "normal, usual, or customary" in the taxpayer's trade or business or it arises from a transaction "of common or frequent occurrence in the type of business involved". <u>Deputy v. du Pont</u>, 308 U.S. 488, 495 (1940). An expense is "necessary" if it is "appropriate and helpful" to the taxpayer's business although it need not be

[*11] absolutely essential.  Commissioner v. Tellier, 383 U.S. 687, 689 (1966) (quoting Welch v. Helvering, 290 U.S. at 113).  But a taxpayer may not deduct personal, living, or family expenses unless the Code expressly provides otherwise.  Sec. 262(a).  Whether an expense satisfies the requirements of section 162 is a question of fact.  Cloud v. Commissioner, 97 T.C. 613, 618 (1991) (citing Commissioner v. Heininger, 320 U.S. 467, 473-475 (1943)).

A taxpayer must prove his entitlement to any deductions claimed.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).  Taxpayers, therefore, are required to maintain sufficient records to establish the amount of any deduction.  Sec. 6001; sec. 1.6001-1(a), Income Tax Regs.; see also Higbee v. Commissioner, 116 T.C. at 440.  Under the Cohan rule, the Court may estimate the amount of an expense if the taxpayer is able to demonstrate that he has paid or incurred a deductible expense but cannot substantiate the precise amount, so long as he produces credible evidence that gives a basis for the Court to do so.  Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930); see also Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985).

Section 274 imposes strict substantiation requirements superseding the Cohan rule for certain expenses, including those for travel.  See sec. 274(d); see

**[\*12]** also Sanford v. Commissioner, 50 T.C. 823, 827-828 (1968), aff'd per curiam, 412 F.2d 201 (2d Cir. 1969); sec. 1.274-5(c)(2)(iii), Income Tax Regs.; sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985). For expenses such as an automobile used for business purposes,[10] a taxpayer must substantiate by adequate records or by sufficient evidence corroborating the taxpayer's own statement: (1) the amount of the expense, (2) mileage for each business use of the vehicle as well as the total mileage for all purposes during the taxable period, (3) the time and place of the travel or use, and (4) the business purpose of the expense. Sec. 274(d)(4); sec. 1.274-5T(b)(6), Temporary Income Tax Regs., 50 Fed. Reg. 46016 (Nov. 6, 1985); see also Shea v. Commissioner, 112 T.C. 183, 186-188 (1999) (disallowing travel-related business expense deductions because the taxpayer failed to comply with the "stringent substantiation requirements of section 274").

To substantiate by adequate records, a taxpayer must provide an account book, a log, or similar record and documentary evidence which together are sufficient to establish each element with respect to an expenditure. Sec. 1.274-

---

[10] Sec. 274(d)(4) provides that no deduction shall be allowed without substantiation for "listed property (as defined in section 280F(d)(4))". Sec. 280F(d)(4) defines the term "listed property" to mean, in addition to other property, any passenger automobile or any other property used as a means of transportation.

**[*13]** 5T(c)(2)(i), Temporary Income Tax Regs., 50 Fed. Reg. 46017 (Nov. 6, 1985). Without adequate records, a taxpayer may still substantiate expenses with sufficiently detailed written or oral statements and other corroborative evidence showing that he incurred the expense. See id. subpara. (3)(i), 50 Fed. Reg. 46020; see also Freeman v. Commissioner, T.C. Memo. 2009-213, 2009 WL 2958663, at *6-*7 (holding that a taxpayer may substantiate business expenses subject to section 274(d) where the records were lost or destroyed "through circumstances beyond the taxpayer's control"). Although a contemporaneous log is not required, corroborative evidence to support a taxpayer's reconstruction "must have a high degree of probative value to elevate such statement" to the level of credibility of a contemporaneous record. Sec. 1.274-5T(c)(1), Temporary Income Tax Regs., 50 Fed. Reg. 46017 (Nov. 6, 1985); see also Freeman v. Commissioner, 2009 WL 2958663, at *7.

Generally, expenses that a taxpayer incurs in commuting between his home and his place of business are personal and nondeductible. Commissioner v. Flowers, 326 U.S. 465, 473-474 (1946); Heuer v. Commissioner, 32 T.C. 947, 951 (1959), aff'd per curiam, 283 F.2d 865 (5th Cir. 1960); secs. 1.162-2(e), 1.262-1(b)(5), Income Tax Regs. However, expenses incurred for traveling between two or more places of business may be deductible as ordinary and necessary business

[*14] expenses under section 162 if incurred for business reasons. Steinhort v. Commissioner, 335 F.2d 496, 503-504 (5th Cir. 1964), aff'g and remanding T.C. Memo. 1962-233; Heuer v. Commissioner, 32 T.C. at 953; see also Fausner v. Commissioner, 55 T.C. 620 (1971) (permitting section 162 deductions for travel between jobs or job locations). But if one of the places of business is the taxpayer's residence, the residence must be the taxpayer's principal place of business for the trade or business the taxpayer conducts at those other locations. See Strohmaier v. Commissioner, 113 T.C. 106 (1999); Curphey v. Commissioner, 73 T.C. 766, 777-778 (1980); Beale v. Commissioner, T.C. Memo. 2000-158, 2000 WL 631398, at *5-*6; cf. Mazzotta v. Commissioner, 57 T.C. 427, 429 (1971) (holding that a taxpayer could not deduct expenses for traveling between his residence and his employment merely because he conducted a second business at home), aff'd, 467 F.2d 943 (2d Cir. 1972).

In addition, a taxpayer may deduct the entire cost of "section 179 property" as a current expense for the year the property is placed in service.[11] Sec. 179(a). If the property is used for both business and other purposes, then the portion of the property's cost that is attributable to the business use is eligible for expensing

---

[11] Sec. 179(d)(1)(C) defines "section 179 property" to include certain property used in the "active conduct of a trade or business."

[*15] under section 179 but only if more than 50% of the property's use is for business purposes. See sec. 1.179-1(d), Income Tax Regs.; see also sec. 280F(b); Whalley v. Commissioner, T.C. Memo. 1996-533, 1996 WL 687033, at *9 (holding that "[t]o claim expensing or depreciation for * * * [listed] property pursuant to sections 179 and 280F, respectively, a taxpayer must establish that business use exceeds 50 percent"). Taxpayers must meet the heightened substantiation requirements of section 274(d) for proving the business use of "listed property". See Singh v. Commissioner, T.C. Memo. 2009-36, 2009 WL 349745, at *1.

Petitioner reported travel-related and car and truck expenses under sections 162 and 179, respectively, on his Schedules F for the years in issue. The primary evidence he submitted in support of his claimed travel-related and car and truck expense deductions is a Microsoft Outlook calendar reflecting his travel during the periods in issue, supplemented by his testimony.[12] He used the calendar for all appointments and events, including those related to his work at the ranch, his work for Dip Co, and his personal activities. Many of the entries on his calendar note

---

[12] Petitioner also submitted insurance payment receipts and his 2016 Form 1040 as evidence supporting his expense deductions for his pickup truck.

[*16] only that he traveled to and/or from the ranch;[13] they do not note the purpose for his visit (hay farming business, Dip Co work, property maintenance, or personal).

Without that information we cannot determine which of petitioner's trips was for a business purpose as required under section 162. See Rutz v. Commissioner, 66 T.C. 879, 882-886 (1976) (disallowing business expense deductions because the taxpayer could not establish the business purpose for each expense); Longino v. Commissioner, T.C. Memo. 2013-80 (disallowing travel-related business expense deductions because the taxpayer did not differentiate his travel purposes between business and personal), aff'd, 593 F. App'x 965 (11th Cir. 2014); Olagunju v. Commissioner, T.C. Memo. 2012-119 (holding the taxpayer's broad testimony and receipts insufficient to establish the business purpose of his travel). For the same reason, neither can we determine whether petitioner's use of the pickup truck for his hay farming business (or DipCo) exceeded 50% of his total use as required by section 179. See Barmes v. Commissioner, T.C. Memo. 2000-254, 2000 WL 1137742, at *4 (disallowing travel-related deductions for two farmers because they "did not establish the percentages of business use of the two

---

[13] Respondent raised questions about several calendar entries at trial. In discussing post-trial briefs, we singled out one conflicting entry as an example to focus their briefs.

[*17] automobiles"), aff'd, 12 F. App'x 415 (7th Cir. 2001). Allowing a deduction without evidence that would allow us to make these determinations would amount to "unguided largesse". See Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957). And we conclude that petitioner's evidence falls far short of the standard we applied in Freeman v. Commissioner, 2009 WL 2958663, at *7. Accordingly, we sustain respondent's adjustments to petitioner's Schedule F travel-related and car and truck expense deductions for the years in issue.[14]

We therefore need not consider respondent's second challenge to petitioner's Schedule F expense deductions, namely, whether petitioner's hay farming qualified as an active trade or business during the years in issue.

III. Qualified Conservation Contributions

A. General Principles

In general, a taxpayer may not claim a deduction for a charitable contribution of property consisting of less than the taxpayer's entire interest in the property. See sec. 170(f)(3). A taxpayer may deduct the value of a contribution of

---

[14] The record includes receipts for some of petitioner's other claimed Schedule F business expense deductions, but he did not explain the expenses in his briefs or his testimony. We will not attempt to connect the dots for him now and therefore conclude that he has abandoned his arguments about those expense deductions. See Thiessen v. Commissioner, 146 T.C. 100, 106 (2016); Mendes v. Commissioner, 121 T.C. 308, 312-313 (2003).

[*18] a partial interest in property, however, if the contribution constitutes a "qualified conservation contribution." See sec. 170(f)(3)(B)(iii). Respondent does not challenge whether the Conservation Easement is a "qualified conservation contribution" but disputes its value and therefore the amount of the deduction.

The amount of a charitable contribution deduction generally is the fair market value of the contributed property at the time it is contributed. Sec. 1.170A-1(a), (c)(1), Income Tax Regs. The parties agree that the Conservation Easement's fair market value should be determined by calculating the difference between the ranch's fair market value before and after petitioner granted the easement. See sec. 1.170A-14(h)(3)(i), Income Tax Regs.; see also Symington v. Commissioner, 87 T.C. 892, 895 (1986); Hilborn v. Commissioner, 85 T.C. 677, 688-690 (1985).

The parties offered case-in-chief and rebuttal expert witness reports and testimony to establish the Conservation Easement's fair market value. An expert's opinions are admissible if they assist the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702(a); Rule 143(g). We evaluate expert opinions in the light of each expert's demonstrated qualifications and the other evidence in the record. See Parker v. Commissioner, 86 T.C. 547, 561 (1986). When experts offer competing estimates of fair market value, we

[*19] determine how to weigh those estimates by examining the factors they considered in reaching their conclusions. See Casey v. Commissioner, 38 T.C. 357, 381 (1962). We are not bound by an expert's opinions and, in the exercise of sound judgment, may accept or reject any of his opinions in full or in part. See Helvering v. Nat'l Grocery Co., 304 U.S. 282, 295 (1938); Parker v. Commissioner, 86 T.C. at 561-562. We also may reach a determination of value on the basis of our own examination of the evidence in the record. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), aff'g T.C. Memo. 1974-285.

We consider each expert's opinions below.

B. Petitioner's Expert

For his case-in-chief and rebuttal, petitioner relied on Mr. Butler, a certified general appraiser in Colorado who has practiced for over 40 years and appraised hundreds of conservation easements. We recognized Mr. Butler here as an expert in real estate appraisal. He previously has been qualified as an expert in numerous cases involving property values of rural tracts of land in Delta County. He testified as a fact witness about his appraisal of a conservation easement in neighboring Gunnison County in Irby v. Commissioner, 139 T.C. 371 (2012).

[*20] Mr. Butler used the sales comparison approach to determine the Conservation Easement's value. He noted that he did not use the income approach because "ranch properties are not typically sold based upon their income."

C. Respondent's Experts

For his case-in-chief and rebuttal, respondent relied on Michael Nash, a certified general appraiser in Colorado who has practiced for 40 years and appraised conservation easements throughout the State. We recognized Mr. Nash here as an expert in real estate appraisal. We previously recognized Mr. Nash as an expert in real estate appraisal in Trout Ranch, LLC v. Commissioner, T.C. Memo. 2010-283, 2010 WL 5395108, aff'd, 493 F. App'x 944 (10th Cir. 2012). Like Mr. Butler, Mr. Nash used the sales comparison approach to determine the Conservation Easement's value.

For his rebuttal respondent also relied on Gary Trudgeon, a certified general appraiser in the State of Colorado who has practiced for 45 years. Mr. Trudgeon has worked as an appraiser for the IRS since 2008 and completed approximately 15 conservation easement appraisal reports. We recognized Mr. Trudgeon here as an expert in real estate appraisal, like Mr. Butler and Mr. Nash.

**[*21]** D. Arguments and Analysis

       1. Highest and Best Use

In deciding a property's fair market value, we first take into account its highest and best use. See Symington v. Commissioner, 87 T.C. at 896; Stanley Works & Subs. v. Commissioner, 87 T.C. 389, 400 (1986); sec. 1.170A-14(h)(3)(i) and (ii), Income Tax Regs. A property's highest and best use also is the highest and most profitable use for which it is adaptable and needed or likely to be needed in the reasonably near future. Olson v. United States, 292 U.S. 246, 255 (1934); Hilborn v. Commissioner, 85 T.C. at 689.

Both Mr. Butler and Mr. Nash began their respective analyses by determining the ranch's highest and best use before and after petitioner granted the Conservation Easement. Mr. Butler determined the highest and best use before the Conservation Easement was as a residential and agricultural property with the potential to be divided into three 40-acre house sites, and after the Conservation Easement was as a nonsubdividable agricultural and residential parcel with a single-family home in the building envelope and another single-family home on the remaining 5 unencumbered acres. Mr. Nash determined that the highest and best use before the Conservation Easement was as a residential and agricultural property with the potential to be divided into one to three working/recreational

[*22] ranches, and after the Conservation Easement was as one recreational/working ranch allowing size-restricted residences and agricultural structures for the encumbered acres and a residential parcel or an assemblage for the remaining five unencumbered acres.

Respondent argues that Mr. Butler incorrectly determined the ranch's highest and best use before and after petitioner granted the Conservation Easement. His rebuttal expert, Mr. Trudgeon, contended that Mr. Butler incorrectly considered the ranch to be in an area with substantial demand for residential development and did not consider the impact of certain topographical features on the ranch's potential for further residential development.[15]

Mr. Butler and Mr. Nash both determined nearly identical highest and best uses for the ranch, however, including residential use. We therefore conclude that the highest and best use for the ranch before the Conservation Easement is as an agricultural and recreational site with the potential to be split into three 40-acre residential single-family home sites and after the Conservation Easement is as an agricultural site with one residence on the encumbered land and one residence on the 5 unencumbered acres.

---

[15] Mr. Nash stated at trial that those topographical features are not atypical to Western Colorado and would not materially impede development.

**[*23]**     2. <u>Before Value</u>

Both Mr. Butler and Mr. Nash determined the ranch's fair market value before petitioner granted the Conservation Easement by completing a direct comparable sales analysis, which involved comparing the ranch to properties sold in the Delta County area that they considered to be comparable. Mr. Butler considered seven comparable properties whose sale prices ranged from $6,568 to $12,313 per acre,[16] while Mr. Nash considered six comparable properties whose sale prices ranged from $2,558 to $8,276 per acre.[17]

To account for each property's differences from the ranch, Mr. Butler and Mr. Nash both used sales and market data in the Delta County area to determine necessary adjustments for each comparable. But they used different methods to determine their respective adjustments.

_____

[16] Mr. Butler contends that the Conservation Easement did not affect the improvements, so he did not consider them when he selected his comparable properties. We explain Mr. Butler's treatment of improvements in more detail <u>infra</u> note 18.

[17] Mr. Nash considered improvements on the ranch when he selected his comparable properties, and he removed the value of any improvements both from the ranch's before value and each comparable property's sale price in his analysis.

**[\*24]**                                  a.  Mr. Butler's Quantitative Valuation

Mr. Butler used a quantitative approach.  He first adjusted each comparable property's sale price to match the market conditions for the ranch as of the date petitioner granted the Conservation Easement (December 2007) by determining the monthly appreciation rates for four of the seven comparables, as well as paired sales of two other properties that he determined were not comparable to the ranch. Deriving a range of rates from 0.4% to 5%, Mr. Butler determined that a 1.5% monthly appreciation rate adjustment was reasonable.  Mr. Butler also considered the 1% monthly appreciation rate listed in the multiple listing service (MLS) statistics, but he rejected that rate because "one very low or one very high sale could skew the indicated rate."

Mr. Trudgeon criticized Mr. Butler's monthly appreciation rate adjustment as being overstated and based on sales that were unreliable to indicate changing market conditions.  Mr. Trudgeon contended that the MLS 1% rate was more reliable since the rate was based on an analysis of over 100 transactions from a three-year period.

Mr. Butler next adjusted each comparable property's sale price to account for location and size differences between each comparable and the ranch.  Because the ranch is close to two major town centers, Paonia and Hotchkiss, he first

[*25] adjusted four of the sales by 15% for properties that are farther south near a smaller town center, Crawford, Colorado. He then adjusted each sale by 5% if the property's size was within 40 acres of the size of the ranch or 10% if the difference was greater than 40 acres. Mr. Butler noted in his report that "the comparison of several of the other sales to each other suggest that the market does not make size adjustment[s]". However, on the basis of the limited market base and his history of appraisal work in Delta County, Mr. Butler determined that a land size adjustment was necessary.

Both Mr. Nash and Mr. Trudgeon criticized Mr. Butler's land size adjustment for not reflecting Mr. Butler's own data. Mr. Nash contended that the comparable properties Mr. Butler used for his analysis showed an average price difference of 14% when adjusting for size relative to the ranch. Mr. Nash determined that a more reasonable land size adjustment to reflect this average price difference would be 10% downward for the sales of properties whose size was within 40 acres of the ranch and 20% downward for the sales of properties that were more than 40 acres smaller than the ranch.

Mr. Butler next adjusted each comparable property's sale price to account for other differences between each comparable and the ranch, including the

[*26] amount of irrigated land, the topography, and any improvements.[18]  He noted in his report that his market analysis for his irrigated land adjustment was "contrary to normal market characteristics" and "suggests that there is no adjustment" to be made.  He adjusted for this difference because the amount of each property's irrigated land "reveal[ed] the contributory value of the * * * [comparable property's] development potential."  Mr. Butler also stated that because the area is "so much influenced by potential house sites, some of the agricultural value of * * * [the irrigated land for] the properties is mitigated."

Mr. Butler's adjustments resulted in prices ranging from $8,617 to $10,713 per acre.  He then analyzed which properties were most similar to the ranch to further narrow his range to $9,262 to $10,713 per acre.  Using this range, he concluded the ranch's fair market value before petitioner granted the Conservation Easement to be $9,500 per acre and $1,150,000 for all 121.14 acres, excluding improvements.

---

[18] Mr. Butler explained that he did not value the ranch's improvements because they were not affected by the conservation easement, but he made a downward adjustment of $950 per acre to sale No. 7 for improvements related to "an older equipment shed and several other small agricultural improvements." The record does not include how Mr. Butler calculated this adjustment or any other explanation of how he considered improvements as part of his adjustments. Although his report and testimony were not specific, we infer from his explanations and conclusions that his before and after valuations did not include the ranch's improvements.

**[*27]**                    b.  <u>Mr. Nash's Qualitative Valuation</u>

Unlike Mr. Butler, Mr. Nash concluded that the Delta County sales and

market data was too inconsistent for him to make quantitative adjustments to the

sale prices of his comparables, so he instead used a qualitative approach.  He

compared several characteristics for each comparable, including market conditions

at the time of sale, location/access, size, aesthetic appeal, zoning, and available

utilities, to evaluate the relative superiority, inferiority, or similarity of each

comparable to the ranch.  He then evaluated the overall comparability of each

property to the ranch.

Mr. Nash used these evaluations to derive prices ranging from $5,330 to

$8,276 per acre for the ranch.  Because the bracketed midpoint of this range was

$6,803, which was almost the same as the per-acre sale price for the property he

determined to be the most comparable to the ranch (sale No. 4) ($6,842), he

concluded that the ranch's fair market value before petitioner granted the

Conservation Easement was, without improvements, $6,800 per acre and $830,000

[*28] for all 121.7 acres,[19] and, including improvements, $11,668 per acre and $1,420,000 for all 121.7 acres.[20]

Mr. Butler criticized Mr. Nash's use of qualitative adjustments for his analysis instead of quantitative adjustments. He argued that the data related to Mr. Nash's comparable properties provided enough consistency to make quantitative adjustments and making such adjustments was customary appraisal practice.

### c. Analysis

The validity of an expert's comparable sales valuation method "depends to a great extent upon the comparables selected and the reasonableness of the adjustments made thereto." Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. 1, 19-20 (1979). He must adjust the sale prices of his comparables upward or downward to reflect "various differences between the 'comparables' and the property being appraised." Talkington v. Commissioner, T.C. Memo. 1998-412, 1998 WL 792212, at *9 (citing Estate of Spruill v. Commissioner, 88 T.C. 1197, 1229 n.24 (1987)); see also Butler v. Commissioner, T.C. Memo. 2012-72, 2012 WL 913695, at *16 (holding that since "no two sales and no two properties are

---

[19] Mr. Nash calculated the Conservation Easement's value using the 121.7 acres stated in the RES report.

[20] Mr. Nash used the replacement cost approach to calculate the value of the ranch's improvements. He determined the improvements' value to be $590,000.

[*29] ever identical," an expert must consider "aspects of the comparable transactions such as time, size, or other significant features and make[] appropriate adjustments for each to approximate the qualities of the subject property"). In other words, an expert makes positive adjustments to comparable properties "that are inferior in some fashion to the subject property" and negative adjustments to comparable properties "that are superior in some fashion to the subject property." Talkington v. Commissioner, 1998 WL 792212, at *9 n.8.

We have accepted adjustments based on qualitative characteristics to determine a conservation easement's value. See Griffin v. Commissioner, T.C. Memo. 1989-130, aff'd, 911 F.2d 1124 (5th Cir. 1990); Losch v. Commissioner, T.C. Memo. 1988-230. We also have rejected an expert's comparable sales analysis where the adjustments simply used subjective labels to compare characteristics between comparables and the subject property. See Crimi v. Commissioner, T.C. Memo. 2013-51, at *54-*58. We held that the expert's report in Crimi was unreliable in part because it only "used qualitative attributes when performing its market analysis." Id. at *58.

Mr. Nash primarily used subjective labels to compare characteristics between each comparable property and the ranch. We reject his contention that this qualitative approach was necessary because the market data around the ranch

[*30] was too inconsistent for making any quantitative adjustments.[21]  Other

experts have used the market data around the ranch to make quantitative

adjustments in valuing nearby conservation easements.  See Hughes v.

Commissioner, T.C. Memo. 2009-94 (both experts used the neighboring Gunnison

County market data to make quantitative adjustments).  But see Trout Ranch, LLC

v. Commissioner, 2010 WL 5395108, at *8 (each expert, including Mr. Nash,

used, in part, the income approach instead of the sales comparison approach to

value a conservation easement because of the lack of comparable property market

sales around Gunnison County).  Because Mr. Nash used the sales comparison

approach and failed to make the necessary quantitative adjustments to his

comparables, but made quantitative adjustments to Mr. Butler's land size

---

[21] Mr. Nash used two sales that occurred after petitioner conveyed the Conservation Easement.  Events occurring after the valuation date are not considered in determining fair market value of the property except to the extent that the events are reasonably foreseeable on the valuation date.  See First Nat'l Bank of Kenosha v. United States, 763 F.2d 891, 893-894 (7th Cir. 1985); United States v. 494.10 Acres of Land in Cowley County, Kan., 592 F.2d 1130 (10th Cir. 1979); Estate of Spruill v. Commissioner, 88 T.C. 1197, 1228 (1987).  The mere fact that the sales an expert uses occurred after the valuation date is not fatal to his determination.  See Estate of Smith v. Commissioner, 57 T.C. 650, 659 (1972), aff'd, 510 F.2d 479 (2d Cir. 1975).  While sales entered into after the valuation date can be used, adjustments need to be made to reflect market changes between the comparable's date of sale and the valuation date.  Eugene D. Lanier, Inc. v. Commissioner, T.C. Memo. 1998-7, 1998 WL 2859, at *9.  Mr. Nash did not make those adjustments.

[*31] adjustments, we reject his qualitative comparable sales analysis. See Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. at 19-21; Eugene D. Lanier, Inc. v. Commissioner, T.C. Memo. 1998-7.

We turn now to Mr. Butler's quantitative comparable property sales analysis. We generally agree with his quantitative approach. We disagree, however, with several of his quantitative adjustments and comparables. First, we agree with Mr. Trudgeon that Mr. Butler's monthly appreciation rate adjustment is too high and instead find that the MLS 1% rate is reasonable. Next, we agree with Mr. Nash that the land size adjustments should better reflect Mr. Butler's own data. Next, we disagree with Mr. Butler's adjustments for other differences as they are too unreliable. Finally, we disagree with Mr. Butler's selection of sales Nos. 4 and 7 as involving suitable comparable properties.[22]

---

[22] The prices per acre for sales Nos. 4 and 7 are $11,327 and $10,195, respectively, after we apply the updated adjustments. These prices are significantly higher than the prices for the other comparables. Sale No. 7 involves the smallest number of acres (40) among all Mr. Butler's comparables, which is two-thirds less than the ranch, and sale No. 4 involves the largest number of acres (195) among the comparables, over 50% more than the ranch. Mr. Butler made several adjustments to account for these differences, but these price discrepancies with the other comparables show that sale No. 7 is not a suitable comparable and sale No. 4 is an outlier.

[*32] Because we find Mr. Butler's analysis to be the best available for the ranch's before value, we adjust Mr. Butler's adjustments to reflect these criticisms as follows:

| Sale No. | 1 | 2 | 3 | 5 | 6 |
|---|---|---|---|---|---|
| Sale price (millions) | $0.385 | $0.62 | $0.65 | $0.43 | $0.625 |
| Price per acre | $6,568 | $7,750 | $6,701 | $9,182 | $7,813 |
| Months[1] | 29 | 7 | 17 | 10 | 7.5 |
| Rate adj.[2] | $8,473 | $8,293 | $7,840 | $10,100 | $8,399 |
| Location adj. | 15% | 15% | 15% | --- | 15% |
| Size adj. | (20%) | (10%) | (10%) | (20%) | (10%) |
| Adj. price per acre | $8,048 | $8,708 | $8,232 | $8,080 | $8,819 |

[1] Months between sale and easement (12/18/07)
[2] Price per acre after 1% monthly appreciation

These calculations result in a range of prices of $8,048 to $8,819 per acre. This range's midpoint is $8,434 per acre. Applying this price per acre to the ranch's entire 121.14 acres, excluding improvements, results in a reasonable before value of $1,021,695.

We note that this valuation is considerably more than petitioner paid for the ranch in 2002, an increase above the MLS monthly appreciation rate of 1% that we adopted above. But respondent did not attack Mr. Butler's valuation on this basis, and Mr. Nash's valuation of $800,000 also exceeds the MLS 1% rate. We will not speculate on why the property might have appreciated so much (such as whether

[*33] petitioner made changes to the property, including improvements, that augmented the value of the land itself). As we explained above, we found Mr. Butler's valuation, with our adjustments, to be the best available before valuation for the property. And as we admonished in Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980), "in the final analysis, the Court may find the evidence of valuation by one of the parties sufficiently more convincing than that of the other party, so that the final result will produce a significant financial defeat for one or the other, rather than a middle-of-the-road compromise which we suspect each of the parties expects the Court to reach." See also Estate of Jones v. Commissioner, T.C. Memo. 2019-101, at *41-*42. Mr. Butler's quantitative analysis was not without flaws, but it was robust and more convincing than Mr. Nash's qualitative averaging.

### 3. After Value

Both Mr. Butler and Mr. Nash determined the ranch's fair market value after petitioner granted the Conservation Easement by completing another direct comparable sales analysis along with a paired sales analysis.[23] Mr. Butler

---

[23] The paired sales analysis involves "a comparison of the fair market value of a property with and without an easement." Gorra v. Commissioner, T.C. Memo. 2013-254, at *57. The fair market value of the property with the easement is divided by the fair market value of the property without the easement to derive a

(continued...)

[*34] separately determined the value of the encumbered portion of the ranch and the five unencumbered acres, while Mr. Nash determined the value of the entire property.

### a. Mr. Butler

For the encumbered portion of the ranch, Mr. Butler considered four properties that had been sold after being encumbered with a conservation easement. One of the properties was near the southern portion of Delta County, Colorado, while the other three were in Colorado but not in the same market as the ranch (the closest property was approximately 75 miles away and the farthest was approximately 130 miles' driving distance away). For the five unencumbered acres, Mr. Butler considered three small acre lots sold in the Delta County area.

As with his before value analysis, Mr. Butler used the sales and market data for the county of each comparable property to adjust the sale price of each. After substantially adjusting each sale price, Mr. Butler analyzed which properties were most comparable to the ranch for each portion of his analysis and ultimately

---

[23](...continued) diminution percentage attributable to the conservation easement in issue. Id. at *57-*58 (citing Strasburg v. Commissioner, T.C. Memo. 2000-94, 2000 WL 288276, at *4 n.8). We have approved this method, which we refer to as the "percentage diminution approach". See, e.g., Butler v. Commissioner, T.C. Memo. 2012-72, 2012 WL 913695, at *30.

**[*35]** determined a fair market value of $450,000 for the encumbered acres and $115,000 for the five unencumbered acres, resulting in the ranch's fair market value after petitioner granted the Conservation Easement, excluding improvements, being $565,000 and the Conservation Easement's value being $585,000.

Mr. Butler also completed a paired sales analysis to determine whether the diminution in value attributed to the Conservation Easement was similar to the diminution attributed to the conservation easements for his four comparable encumbered properties. He calculated a 50.87% diminution in value for the ranch. For his comparables, he calculated diminutions in value of 24.64%, 37.5%, 44.16%, and 63%.[24] Because the ranch's diminution in value was within this range of values, he concluded that his comparable sales analysis was sound.

Both Mr. Nash and Mr. Trudgeon criticized the 50.87% diminution in value Mr. Butler attributed to the Conservation Easement. They argued that the diminution percentage was unreasonably high and not supported by Mr. Butler's own data. They also disputed the accuracy of the largest diminution in value (63%) of Mr. Butler's comparables.

---

[24] Mr. Butler's report misstates this property's diminution in value to be 65% instead of 63%.

**[*36]** b. <u>Mr. Nash</u>

Mr. Nash considered four properties (excluding improvements) that had been sold after being encumbered with a conservation easement. These four properties were in Colorado, but none was in the same market as the ranch (the closest property was approximately 60 miles away and the farthest was several hundred miles away). Mr. Butler criticized Mr. Nash's failure to consider at least one local comparable encumbered property for his after value analysis.

As with his before value analysis, Mr. Nash used a qualitative approach to evaluate the relative superiority, inferiority, or similarity of several characteristics of each comparable property to the ranch. He then evaluated the overall comparability of each property to the ranch and derived prices ranging from $3,947 to $5,031 per acre for the ranch. Because the bracketed midpoint of his range was $4,489 per acre, he concluded that the ranch's fair market value after petitioner granted the Conservation Easement was, excluding improvements, $4,500 per acre and $550,000 for all 121.7 acres, and, including improvements $9,367 per acre and $1,140,000 for all 121.7 acres.

Mr. Nash also completed a paired sales analysis to determine the diminution in value that should be attributed to the Conservation Easement. He examined the diminution attributed to the conservation easements for his four comparable

[*37] encumbered properties and calculated diminutions in value of 38%, 41%, 34%, and 19%. He concluded that a 33% diminution in value should apply.[25] Mr. Nash then adjusted the seven sales from his before value analysis downward by 33% to derive a range of prices from $3,571 to $5,545 per acre for the ranch. Because the bracketed midpoint of this range was $4,584, he concluded the ranch's fair market value after petitioner granted the Conservation Easement to be, excluding improvements, $4,560 per acre and approximately $555,000 for all 121.7 acres, and, including improvements, $9,409 per acre and $1,145,000 for all 121.7 acres.

The two fair market values Mr. Nash calculated from his two separate analyses differed by approximately 1%. He determined that the paired sales analysis value provided a more credible indication of fair market value, so he concluded that the ranch's fair market value when excluding improvements was $555,000. Mr. Nash added in the $590,000 worth of improvements and calculated the ranch's full fair market value after petitioner granted the Conservation

---

[25] Mr. Nash calculated this value by excluding the 19% diminution in value, calculating the average for the remaining diminutions (35%), and then multiplying that average by 95% to account for the five unencumbered acres. We note that his resulting 33% diminution in value is the same as averaging all four data points including the 19% diminution.

[*38] Easement to be $1,145,000 and the Conservation Easement's value to be $275,000.

c. Analysis

Both experts' postencumbrance direct comparable sales analyses suffer from a lack of suitable comparables.[26]  Specifically, all of Mr. Nash's comparables and all but one of Mr. Butler's encumbered comparables were in different markets throughout Colorado far from the ranch.  All of the comparables for each expert, including Mr. Butler's local comparable in Delta County, required significant adjustments.  Where the comparables are relatively few in number, we look for a greater similarity between comparables and the subject property.  Cf. Estate of Heck v. Commissioner, T.C. Memo. 2002-34.  We do not find any of these to be suitable comparables for the ranch.[27]  We therefore reject both experts' postencumbrance direct comparable sales analyses.  See Chapman Glen Ltd. v. Commissioner, 140 T.C. 294, 343 (2013) (rejecting an expert's comparable sales

---

[26] Mr. Nash's postencumbrance direct comparable sales analysis also suffers from the same lack of quantitative adjustments problem we discussed above for his before-value direct comparable sales analysis.  See Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. 1, 19-20 (1979).

[27] Since we reject both experts' comparables, we need not go into their adjustments in detail; likewise, we need not evaluate Mr. Butler's direct comparable sales analysis for the five unencumbered acres.

[*39] in part because the properties "were for the most part not comparable" to the subject properties).

We conclude, however, that their comparables are acceptable to determine a proper diminution in value. See Butler v. Commissioner, 2012 WL 913695, at *30 (stating that the diminution in value approach "has been employed most often where, as in the instant case, comparable sales of easement-encumbered properties are not available for the locale of the property being appraised"). The experts' diminution in value analyses were similar in that each expert used four comparables that included a significant outlier. Specifically Mr. Butler used a comparable with a 63% diminution in value that was almost 20% higher than any other comparable's value, while Mr. Nash used a comparable with a 19% diminution in value that was 15% lower than any other comparable's value.

Experts lose their usefulness and credibility when they include unreasonably high or low values in their analyses. See Zarlengo v. Commissioner, T.C. Memo. 2014-161, at *45. As we are not bound by the values computed by either expert, we can remove the outlier values from each expert's analysis. See id. The midpoints for each expert's remaining range of values are only a little more than 2% apart (35.42% for Mr. Butler and 37.6% for Mr. Nash). We find these ranges of values to be much more useful and will adopt the midpoint between these two

**[*40]** ranges--36.5%--as a reasonable diminution of value. Applying this adjusted diminution in value to the ranch's before value results in an after value of $648,776.

E.  Conclusion

Starting with the $1,021,695 before value for the ranch and applying the Conservation Easement's 36.5% diminution in value results in an after value of $648,776. Accordingly, we conclude that the Conservation Easement's value is $372,919.

Any contentions we have not addressed we deem irrelevant, moot, or meritless.

To reflect the foregoing,

Decision will be entered under

Rule 155.